HILGENDORF v ST JOHN HOSPITAL AND
MEDICAL CENTER CORPORATION

Docket No. 215311. Submitted March 5, 2001, at Detroit. Decided May 11,
2001, at 9:00 A.M.

Sandra and David Hilgendorf, as next friends of Christopher Hilgen-
dorf, brought an action in the Wayne Circuit Court against St. John
Hospital and Medical Center Corporation, Nicholas C. Relich, M.D.,
Ali Rabbani, M.D., and others, alleging medical malpractice in the
care of Christopher. Christopher had been transferred to the Neo-
natal Intensive Care Unit (NICU) of St. John Hospital shortly after
being born prematurely. Drs. Relich and Rabbani practiced in and
directed the NICU while Christopher was a patient there. The plain-
tiffs' proofs sought to show that while in the NICU Christopher had a
subdural hematoma that caused intracranial pressure, that Christo-
pher's symptoms while in the NICU were consistent with a subdural
hematoma, and that Drs. Relich and Rabbani failed to diagnose that
condition and failed to treat the condition with a subdural tap. The
defense proofs sought to show that Christopher's symptoms were
consistent with a number of conditions in addition to a subdural
hematoma, that the course of observation and treatment ordered
was proper under the circumstances, and that it would have been
impossible to do a subdural tap safely in the place that the plain-
tiffs alleged that the hematoma was located. The jury returned a
verdict of no cause of action with respect to Drs. Relich and Rab-
bani and the hospital. The court, Cynthia Diane Stephens, J., denied
the plaintiffs' motion for a new trial. The plaintiffs appealed. Drs.
Relich and Rabbani and the hospital cross appealed.

The Court of Appeals held:

1. The trial court did not err in refusing to grant the plaintiffs a
new trial on the basis of defense counsel's alleged misconduct in
removing certain exhibits from the courthouse before the jury
started its deliberations, thereby depriving the jury of evidence that
it needed to render a verdict. The exhibits in question were defense
exhibits, one being the original of the hospital record and the other
being a copy of the records of a doctor who had performed neuro-
surgery on Christopher when he was four months old. The defen-
dants argued that the plaintiffs' counsel agreed to, or acquiesced in,

the return of the original record to the hospital and had stipulated the use of the copy of that record in the possession of the plaintiffs' counsel and that the missing defense exhibit was identical to two copies of the same records that were admitted as plaintiffs' exhibits and were available to the jury. Because the plaintiffs' counsel did not object to defense counsel's assertion during the discussion of exhibits at the close of proofs that there had been a stipulation concerning the return of the original records and the use of the copy of those records, the record does not support an assertion that defense counsel committed any type of misconduct, either intentional or unintentional, with respect to the original hospital records. Neither does the record support that the copy of the doctor's records that was admitted as a defense exhibit was missing as a result of attorney misconduct.

2. The trial court did not err in waiting until after trial began to admit the defendants' admissions. About four months before trial, the plaintiffs filed a motion in limine, asking the court to admit the defendants' responses to the plaintiffs' requests for admissions. Because of the number of admissions sought and the fact that the manner of the presentation of the requests for admissions and the responses to those requests made it difficult to understand what was being admitted, the court refused to sign the proposed order and ordered the plaintiffs' counsel to prepare a chart pairing each request with the corresponding response. The matter of admissions was not resolved before the trial commenced. The plaintiffs' counsel orally moved to admit the admissions on the day of opening arguments, but the court indicated that it wanted a motion in writing. Eventually, about a week before the end of the trial, the court entered an order admitting the admissions. While it might have been prudent to rule on the question of the admitting of the admissions in advance of trial, the trial court had good cause to delay ruling on the plaintiffs' motion to admit until the motion had been put in a form that did not lend itself to confusion. Under the circumstances, the court did not abuse its discretion in waiting to rule on the motion until it was presented with an order that clearly outlined the specific requests and responses that were being admitted at trial. In any event, the plaintiffs have not shown that the delay in admitting the admissions resulted in any error that would require the setting aside of the jury's verdict.

3. The trial court erred in refusing to give the plaintiffs' requested instruction pursuant to SJI2d 3.13 relative to the fact that the jury must accept the facts admitted in the defendants' admissions, but the error does not require that the jury's verdict be set aside. The plaintiffs' counsel appeared to acquiesce in the court's ruling that

the admissions were not a matter of judicial notice, but rather properly a matter handled by the admitting of the admissions as an exhibit. Further, because none of the admissions related to subjects disputed at trial, the error in failing to give the requested instruction was harmless.

4. The trial court did not err in ruling that MRE 707 permits learned treatises to be used during redirect examination to rehabilitate a witness, or in permitting the defendants' counsel to read from the treatise to determine whether one of the defendants' expert witnesses agreed with the treatise. During the cross-examination of one of the defense experts, the plaintiffs' counsel asked the witness whether he was familiar with a particular medical textbook and established that the witness believed that it was a good textbook. On redirect, the defense counsel, over an objection that the textbook could not be used for rehabilitation, elicited the witness' agreement with the textbook's observations concerning the value of subdural taps where there is a suspected subdural hemorrhage. Although MRE 707 provides that statements contained in learned treatises are "admissible for impeachment purposes only," impeachment purposes include not only impeachment of a witness on cross-examination, but also include rehabilitation of such a witness on redirect examination. Accordingly, to the extent that a learned treatise is used to impeach a witness on cross-examination, that treatise may be used to rehabilitate the witness with respect to the subject matter on which the impeachment was focused. Because it is a close question whether the questioning of the expert witness by the plaintiffs' counsel concerning the learned treatise actually impeached the witness, it is a close question whether there was a need to rehabilitate the witness. However, because the objection raised by the plaintiffs' counsel related to whether the treatise could be used to rehabilitate the witness, not to whether the question asked did rehabilitate the witness, and because there was nothing in this brief exchange that was likely to render the entire trial unfair, there was no error requiring the setting aside of the jury's verdict.

Affirmed.

1. TRIAL — JURY INSTRUCTIONS — ADMISSIONS — JUDICIAL NOTICE.

It is error for a court to refuse to give the jury instruction relating to judicially noticed facts with respect to facts that have been admitted as a result of responses to requests for admissions (SJI2d 3.13).

2. WITNESSES — IMPEACHMENT — LEARNED TREATISES — REHABILITATION.

Statements in a learned treatise may be used to rehabilitate a witness on redirect examination where the learned treatise has been used

on cross-examination to impeach that witness; only the material in the learned treatise that relates to the same subject matter as was used on cross-examination for impeachment may be referred to on redirect examination for rehabilitation (MRE 707).

*Mark L. Silverman, M.D., J.D., P.C.* (by *Mark L. Silverman*), for the plaintiffs.

*Kitch Drutchas Wagner Denardis & Valitutti* (by *Susan Healy Zitterman* and *Anthony G. Arnone*), for the defendant.

Before: WHITBECK, P.J., and MCDONALD and COLLINS, JJ.

PER CURIAM. Plaintiffs Sandra and David Hilgendorf, as next friends for their minor son, Christopher Hilgendorf, appeal as of right in this medical malpractice case.[1] Through a combination of a directed verdict and the jury's verdict of no cause of action, the Hilgendorfs did not recover damages for their son's alleged injuries from the defendants who remained parties at trial. St. John Hospital and Medical Center Corporation, Dr. Nicholas C. Relich, M.D., and Dr. Ali Rabbani, M.D., cross-appeal as of right, offering alternative grounds for affirming in this case. We affirm in the appeal and, therefore, do not need to reach the issues raised in the cross-appeal.

## I. OVERVIEW

This case concerns the treatment Hilgendorf received while at the defendant hospital after he and his twin sister, Heidi Hilgendorf, were born five to six weeks prematurely. On appeal, the Hilgendorfs claim

---

[1] We refer to Christopher Hilgendorf as "Hilgendorf" and to his parents as "the Hilgendorfs."

that they are entitled to a new trial because defense counsel removed exhibits from the courtroom before the jury was able to deliberate, the trial court erred in declining to rule on their motion in limine to admit certain defense admissions before trial, the trial court committed instructional error, and the trial court erred in allowing the defense to use a learned treatise to rehabilitate its own witness. These procedural and evidentiary issues have very little to do with the medical malpractice Drs. Relich and Rabbani and the hospital allegedly committed. As a result, we relate only the barest of details concerning the parties' conflicting theories and the complicated evidence they each introduced to provide a context for this case. The facts relevant to each issue are related in the respective analytical sections, below.

## II. THEORIES OF LIABILITY

Hilgendorf and his twin sister were born at Bon Secours Hospital in December 1983. Because they were born prematurely, they were transferred to the Neonatal Intensive Care Unit (NICU) at the defendant hospital. Drs. Nicholas Relich and Ali Rabbani practiced in and directed the NICU during the time Hilgendorf was a patient there. Although he had no memory of treating Hilgendorf, Dr. Relich conceded that, on the basis of the schedule in place at the time, he, not Dr. Rabbani, actually treated Hilgendorf. Drs. Calier H. Worrell, Eugene H. Crawley, and Thelma T. Tumacder, pediatricians in Grosse Pointe Pediatrics, a group practice, treated Hilgendorf while he was in the

NICU and after he was discharged.[2] Dr. Benjamin F. Haddad was the neurosurgeon who consulted on Hilgendorf's care while he was in the hospital.[3]

The Hilgendorfs' theory was that, in the first three days after he was born, their son developed a subdural hematoma, an accumulation of blood under the dura, a membrane that surrounds the brain. The subdural hematoma caused intracranial pressure, ultimately harming Hilgendorf's brain tissue. They contended that several signs their son exhibited while in the NICU, including arm and leg tremors, half-open "sunset eyes," a full anterior fontanel, which is the soft spot on the back of a newborn baby's head, and a relatively rapid increase in the circumference of his head, were signs that he had intracranial pressure. Further, the Hilgendorfs believed that their son's low platelet count while in the NICU was evidence that he was experiencing bleeding associated with the subdural hematoma.

Despite these symptoms, the doctors had not diagnosed Hilgendorf's ailment by the time he was discharged from the hospital. At home, he suffered a rapid growth in the circumference of his head, which his mother noted and which finally prompted the physicians to take action. Dr. Alexa Canady, not Dr. Haddad, ultimately performed neurosurgery on Hilgendorf four months after he was born. Her preoperative diagnosis was that he had an "[a]rachnoid cyst, right tem-

---

[2] They do not participate in this appeal because they were dismissed as defendants when they settled with the Hilgendorfs before trial.

[3] The Hilgendorfs sued Dr. Haddad for breach of contract and misrepresentation, not malpractice. Dr. Haddad died before this case went to trial. The trial court granted his estate a directed verdict during trial. Although the Hilgendorfs moved for a new trial on the claims against him, they do not challenge the decision to dismiss those claims.

ple region, with mass effect." During surgery she
found cerebrospinal fluid "under significant pressure,"
which was xanthochromic, meaning a yellowish color.
Following surgery, Dr. Canady diagnosed Hilgendorf's
condition as a "porencephalic cyst right temple region
with mass effect and increased intracranial pressure."

The Hilgendorfs claimed that Drs. Relich and Rab-
bani committed malpractice by failing to diagnose
their son's condition and by failing to treat it with a
subdural tap, i.e., by inserting a needle through the
fissures naturally present in his skull to drain the
accumulated blood in order to relieve the pressure on
his brain. The Hilgendorfs also asserted that Drs.
Relich and Rabbani were negligent in failing to make
sufficient notes concerning his progress and care in
his medical chart, especially notations regarding the
circumference of his head during his first week of
life, and in following Dr. Haddad's recommendation
that they merely monitor the situation. They argued
that Dr. Canady's findings supported their theory that
their son had a subdural hematoma. Pointing out that
accumulated blood, such as in a bruise, turns
xanthochromic as it is resolving itself and disappear-
ing, they claimed that his subdural hematoma was
chronic and resolving itself, although still causing
harmful intracranial pressure, when Dr. Canady oper-
ated. In other words, the Hilgendorfs apparently theo-
rized that the blood in the subdural hematoma had
clotted or solidified to the extent that it appeared to
be a cyst. Had their son received the tap at an early
time, the Hilgendorfs claimed, he would not have
experienced intellectual delays that will, according to
his experts, always require him to live in a supervised

setting and deprive him of the ability to earn a living in anything but a special program.

Drs. Relich and Rabbani and the hospital (hereinafter "defendants") had a different opinion on the cause of Hilgendorf's developmental delays. First, they claimed that many of the signs the Hilgendorf's claimed were symptoms of intracranial pressure or a subdural hematoma are in fact common to babies born prematurely, not necessarily evidence that Hilgendorf was experiencing any problems while hospitalized. For instance, their witnesses testified that a sleepy baby who is trying to awake will often have half-open eyes that may be described as "sunset eyes." Also, though a bulging fontanel is a sign of intracranial pressure, a full, flat, or soft fontanel is not a sign of intracranial pressure. Though there were a few nursing notes that showed Hilgendorf's fontanel was "full," no one observed him with a bulging fontanel. Further, a baby's position (lying or being held upright), disposition (calm or crying), and the subjective nature of the person observing the fontanel will affect how the person describes the fontanel. Defendants believed that the circumference of Hilgendorf's head was not growing at an usually high rate while he was in the hospital, that his parents were properly instructed to measure the circumference of his head while he was at home, and that only while he was at home did it grow at an alarming rate.

Defendants provided testimony that suggested that Hilgendorf's platelet levels were appropriate for his age and that he was given a blood transfusion the one time the levels were too low. These low platelet levels could have been caused by something other than a subdural hematoma and, even if he had a subdural

hematoma in the place the Hilgendorfs claimed, it was impossible for physicians to perform a subdural tap in the area because needles do not curve and the only direct route to the area was through brain tissue. Destroying brain tissue would have been inappropriate. The doctors were aware that other tests revealed that Hilgendorf *may* have had a subdural hematoma, but, as Dr. Haddad recommended, a conservative approach was best in light of the risks of surgery on a premature baby and the possibility that Hilgendorf may have had some other condition, as Dr. Canady later confirmed. Defendants claimed that at the time he was discharged, Hilgendorf was doing well and did not need any immediate intervention. Dr. Relich believed that some sort of trauma before or during birth caused Hilgendorf's developmental delays. Defense expert Dr. Karen Hufnagel, M.D., a neonatologist, concluded that Hilgendorf had been infected with cytomegalovirus, a common virus, before he was born, causing the injury to his brain.

### III. DISAPPEARING EXHIBITS

#### A. FACTS

On the last day of trial, following closing arguments and the trial court's instructions to the jury, but before the jury began deliberating, the trial court informed counsel that they should gather and organize the exhibits used at trial. The attorneys then proceeded to comb through the exhibits, challenging any items they claimed had not been admitted and stipulating that certain enlarged exhibits would be admissible in lieu of the originals.

When the parties reconvened the next morning, the attorneys continued to dispute whether certain exhibits had been admitted into evidence and would be submitted to the jury during its deliberations. The first area of concern for the parties and the trial court was Hilgendorf's medical record from the hospital. Evidently, an original and several copies were used at trial and the original was referred to as exhibit D. When the trial court asked for exhibit D, Anthony Arnone, who represented defendants, stated, "That was an original record and by stipulation, which I thought was on the Record, your Honor, we would go with Mr. Silverman's [plaintiffs' counsel] copy." The trial court responded, "If that was the exhibit, that was the agreement. Let me indicate that D has been withdrawn and was withdrawn on the Record."

The parties then began discussing enigmatic exhibit E, Dr. Canady's records. According to Arnone, there were two copies of exhibit E, marked at trial as plaintiffs' exhibits 11 and 15, both of which had been entered. The trial court inquired whether "E would be withdrawn," evidently meaning one of the copies. Michael Rinkel, Dr. Haddad's attorney, indicated that withdrawing one was not a problem. However, Silverman objected that the two exhibits E were not identical and both should be given to the jury. Arnone disputed that the two exhibits were at all different. The trial court stated that offering so many exhibits might overwhelm the jurors and distract them from discussing the merits of the case, but capitulated to marking "the darn thing E as it was, [which] would give the Jury even more weight." When Arnone attempted to stipulate to withdraw exhibit E, Silverman refused. Recapitulating the parties' pro-

gress in organizing the exhibits, Arnone stated, "The jurors . . . should have Exhibits . . . A, B, C, E, no, D, and every other letter straight through. Your honor, there is no E here. It was not my exhibit." The trial court responded:

Counsel, here is what happened. On the Record in Court after asking three times, I was given this Exhibit List. It is not—it is an exhibit list which this one came from the Defendants. On the defendant's exhibit list that they gave me, they got the stipulation of Mr. Silverman [plaintiffs' counsel] for the admission of E. On the Record, the Court admitted it. And E needs to be found from somewhere.

*Mr. Arnone*: I can go back and look in my car.

*Mr. Rinkel*: It's another copy for Dr. Canady's records. I did not admit that.

*The Court*: Yes, you did. You admitted it. I read this on the Record. I read stipulations. They were admitted. So this is a fiction. They were admitted. Why it's not hear [sic], I don't understand. Why anything left this courtroom that was admitted, I don't understand. But it happened before, so it wouldn't shock me. But E was admitted.

So what is your plan to see to it that an Exhibit E, whatever it may be, appears?

*Mr. Silverman*: I have suggestions if it please the Court, how about if one of those Dr. Canady exhibits that's already marked with a Plaintiff's Exhibit Number also carries Defendants Exhibit Number—

*Mr. Arnone*: That's fine.

*The Court*: Mr. Silverman, the only reason we're in this place is because I asked you if you would indicate whether Exhibit E was identical to two other exhibits. You said, no, they're not. Now I don't know what you had in your hand at the time when you were having that discussion, but the [sic] no they're not [identical] was the basis on which we even got here.

*Mr. Silverman*: I said [exhibits] 10 and 15 were not identical.

*The Court:* Nobody said anything to you. The subject at that point was E. I don't know what subject you were having.

*Mr. Silverman:* E is not here. I cannot speak to E.

*The Court:* Then we don't need it. If you would agree that E would either by [sic: be] identical to [exhibits] 10 or 15, then it doesn't matter.

The letter was never referred to relative to the witnesses. The other odd thing I keep track of is whether or not I ever got testimony calling an exhibit name, and I put initials next to it. There are no initials next to E, so nobody is going to have notes that say, on exhibit E, I want to go look at this. Nobody ever used the thing, so it's gone the way of all this, both E and D.

After they jury returned the verdict of no cause of action, the Hilgendorfs moved for a new trial or judgment notwithstanding the verdict against defendants, arguing that Arnone had removed exhibit E from the courtroom as an act of desperation and that removing the exhibits constituted attorney misconduct and deprived them of a fair trial. The trial court denied the motion without oral argument on June 9, 1998, but did not explain its decision.

On appeal, the Hilgendorfs first contend that the trial court erred in denying the motion for a new trial because Arnone's actions in this case constituted attorney misconduct, which deprived the jury of the evidence it needed to render a verdict and which ultimately made the trial unfair. Further, they contend, the absence of this exhibit cannot be considered harmless because it was used at trial and other copies were unreadable. Defendants argue that there was no misconduct in this case because Arnone only returned the original hospital record, not the copies, and he did so by stipulation. They contend that all

admitted materials remained in the courtroom, that there is no evidence that Arnone removed the neurosurgery record, and that using duplicate copies of records was acceptable under the rules of evidence.

### B. STANDARD OF REVIEW

Whether to grant or deny a motion for a new trial is entrusted to a trial court's discretion, which requires appellate review to be for an abuse of that discretion.[4]

### C. ANALYSIS

MCR 2.611(A)(1)(b) permits a trial court to grant a motion for a new trial if the prevailing party committed "misconduct," affecting the moving party's substantial rights. In *Reetz v Kinsman Marine Transit Co*,[5] the Michigan Supreme Court articulated the analysis that must be used to determine whether attorney misconduct warrants a new trial:

> When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and

---

[4] MCR 2.611(A)(1); *Setterington v Pontiac General Hosp*, 223 Mich App 594, 608; 568 NW2d 93 (1997).

[5] *Reetz v Kinsman Marine Transit Co*, 416 Mich 97, 102-103; 330 NW2d 638 (1982).

may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. Tainted verdicts need not be allowed to stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action.

The primary flaw in the Hilgendorfs' argument is that they cannot provide evidence from the record substantiating an error, much less a prejudicial error as required by *Reetz*.

With regard to exhibit D, the original hospital record, Arnone said that Silverman stipulated on the record to allow him to remove it from the courtroom. The trial court agreed and, originally, relied on that explanation when determining what exhibits were to be submitted to the jury. If Silverman had disagreed with Arnone's characterization of their stipulation, he did not note his disagreement on the record at the time the pertinent discussion occurred. The cold record before us leaves no room to conclude that Arnone committed any sort of misconduct, intentional or unintentional. Even if Arnone did act improperly to some degree, "[a] party is not allowed to assign as error on appeal something which his or her own counsel deemed proper at trial since to do so would permit the party to harbor error as an appellate parachute."[6]

With respect to exhibit E, no one testified about seeing Arnone remove exhibit E from the courtroom or about finding the exhibit in his office or otherwise under his control. The only evidence plaintiffs have to tie Arnone to the missing exhibit E is Arnone's com-

---

[6] *Dresselhouse v Chrysler Corp*, 177 Mich App 470, 477; 442 NW2d 705 (1989).

ment that he was willing to check his car for the exhibit. In defendants' brief on appeal, Arnone casts his statement on the record as an attempt at "levity." Whether he intended the statement as a joke at the time he made it is irrelevant. Arnone's comment is logically interpreted as an offer to look for the exhibit. By its plain language, the statement was not an admission of wrongdoing by him or his associates, whether purposeful or inadvertent. At the time the attorneys and the trial court were discussing the problem, Silverman did not suggest that Arnone had taken the exhibit or committed some sort of conduct resulting in its disappearance. In fact, Silverman appeared content to use duplicates of the exhibit.[7] There simply is no way to determine from the record how exhibit E was misplaced. Additionally, the record makes it impossible to determine exhibit E's exact nature and what role it played at trial.

Even if exhibit E was missing because of attorney misconduct, it is impossible to determine how withholding this evidence from the jury negatively affected the verdict. The exhibits that were primarily relevant to malpractice, including what appears to be all the medical records, were discussed in depth. There were numerous occasions during trial when the attorneys questioned the witnesses about how Hilgendorf was treated and what Dr. Canady discovered, reading the record line by line to elicit specific responses. This allowed the Hilgendorfs an opportunity to present their whole case to the jury. It is

---

[7] When pressed to explain how plaintiffs' trial exhibits 11 and 15 differed, which Arnone asserted were duplicates of exhibit E, Silverman could only emphasize that the jury had seen both during trial and should be allowed to see both during deliberations.

impossible to tell how exhibit E fit into the trial. Further, it is possible to infer from Silverman's failure to object to submitting the case to the jury without exhibit E that he concluded that the jury had all the evidence it needed to render a fair verdict, including the substance of exhibit E. This is not to say that courts should tolerate attorney misconduct, especially evidence tampering, to any degree. However, without any evidence that Arnone actually removed exhibit E from the courtroom, it is impossible to reason that the trial court erred in denying the motion for a new trial that was founded in an allegation of attorney misconduct.

For the purpose of appellate review, it would have been helpful for the trial court to explain its decision Nevertheless, for whatever reason the trial court denied the motion, it reached the correct result. Therefore, this issue does not provide grounds for relief from the jury's verdict for the Hilgendorfs.[8]

### IV. REQUEST FOR ADMISSIONS

#### A. FACTS

Approximately four months before trial, on September 3, 1997, the Hilgendorfs brought a motion in limine asking the trial court to admit defendants' responses to their requests for admissions at trial. At the October 10, 1997, hearing scheduled to address several motions, the trial court indicated that, even though it had seen the requests for admissions, it had

---

[8] See *Glazer v Lamkin*, 201 Mich App 432, 437; 506 NW2d 570 (1993) ("[W]e will not reverse where the right result is reached for the wrong reason.").

not received a motion requesting that it admit defendants' admissions. The proposed order the Hilgendorfs submitted that day asked the trial court to admit into evidence ninety-eight separate requests for admissions submitted to different defendants. The order referred to these requests by their number alone, did not mention the substance of the request for the admission, and did not assert whether each defendant had answered the requests or whether the answer admitted or denied the request. Because the requests for admissions and the responses did not appear on the same pages, these materials were voluminous and difficult to understand. Consequently, the trial court refused to sign the proposed order and instead asked plaintiffs' counsel to prepare a chart pairing each request for an admission with each defendant's response.

The trial court scheduled a hearing on the motion for Friday, December 19, 1997. The parties and the trial court discussed defendants' replies to the requests for admissions at length, including requests that defendants claimed were ambiguous and so had not answered. In addressing each disputed request, the trial court either ruled that the request was clear and required a certain answer or that defendants had to clarify their answer. The trial court did not enter an order admitting the admissions that day because it gave defense counsel until the following Monday, December 22, 1997, to contact defendants and supplement the answers to the request for admissions.

The record does not reveal whether the parties convened on Monday, December 22, 1997, for the hearing.

On the day of opening statements at trial, January 6, 1998, Silverman, plaintiffs' counsel, raised this admissions issue again. The trial court indicated that it would not sign an order for a motion that had not been filed in writing and that it preferred to hold a hearing before ruling on a motion. Further, the trial court commented:

> The last opportunity that I unfortunately had to visit the issue of admissions was in the presence of a colleague of yours whose name I frankly do not remember who appeared especially for a hearing on the issue of admission who left this courtroom telling me that this had been taken care of and that there were no outstanding matters. That's what I [was] left knowing.
>
> So if there continue to be outstanding matters it has not been formally made known to me by motion, pleading or paper. But at this point I think perhaps we should get to the heart and soul of this which is to actually begin this trial and to allow the Jury in fact to hearing opening statement.

Silverman also attempted to get the trial court to rule on the motion following a day of trial testimony, on January 12, 1998. Evidently, as the jury was leaving the courtroom, Silverman mentioned the admissions issue, prompting the trial court to reiterate that it wanted him to file the motion in writing and then to have a hearing before it would rule on the issue. The Hilgendorfs subsequently filed a proposed order covering a limited number of the requests for admissions. On January 14, 1998, the trial court briefly acknowledged receiving the proposed order and mentioned that it would hear arguments on the order the following day. The trial court noted that it also would allow the Hilgendorfs to provide additional evidence in light of the admissions. The next day, the trial court

altered the admissions slightly and signed the order on January 21, 1998, approximately one week before the end of trial.

On appeal, the Hilgendorfs argue that the trial court committed error requiring reversal by failing to sign the order earlier. They contend that the trial court had an obligation to decide the motion before trial commenced because whether the admissions were admissible into evidence affected how their case would be presented. In particular, the Hilgendorfs claim that the trial court's failure to admit these admissions allowed defendants and their expert witnesses to testify at trial that there was fluid in Hilgendorf's brain, not in his subdural space, contrary to what the defendants stated in their admissions.

## B. STANDARD OF REVIEW

Appellate courts review evidentiary issues to determine if the trial court abused its discretion.[9]

## C. ANALYSIS

MCR 2.312 governs requests for admissions. MCR 2.312(A) permits a party to make "a written request for the admission of the truth of a matter . . . that relates to statements or opinions of fact or the application of law to fact, including the genuineness of documents described in the request." The party asked to make an admission must then object to the request, or admit or deny the substance of the request for admission, in a timely manner.[10] A failure to

---

[9] See *People v Fink*, 456 Mich 449, 458; 574 NW2d 28 (1998).

[10] MCR 2.312(B).

respond to the request is interpreted as an admission.[11] A request for admissions and any response "must be filed with the court either before service or within a reasonable time thereafter."[12] "A matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of an admission."[13]

The Michigan Supreme Court examined the purpose and effect of MCR 2.312 extensively in *Radtke v Miller, Canfield, Paddock & Stone*.[14] The Supreme Court differentiated between admissions under MCR 2.312, which are "judicial admissions," and admissions by a party opponent under MRE 801(d)(2), which are "evidentiary" admissions.[15] Judicial admissions are " 'formal concessions in the pleadings in the case or stipulations by a party or its counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.' "[16] The Supreme Court stated:

> [A]dmissions under MCR 2.312 are more a matter of civil procedure than of evidence law. The party who makes such an admission "has conclusively (or 'judicially') admitted such facts . . . and the opposing side need not introduce evidence to prove the facts." 2 Jones, Evidence (6th ed), § 13C:14, p 310 (Nov 1995 supp).[17]

---

[11] MCR 2.312(B)(1).

[12] MCR 2.312(F).

[13] MCR 2.312(D)(1).

[14] *Radtke v Miller, Canfield, Paddock & Stone*, 453 Mich 413; 551 NW2d 698 (1996).

[15] *Id.* at 420.

[16] *Id.*, quoting 2 McCormick, Evidence (4th ed), § 254, p 142.

[17] *Radtke, supra* at 420.

Although both types of admissions are "subject to all pertinent objections to admissibility that might be interposed at trial," parties may attempt to explain or disprove an evidentiary admission, while a judicial admission is beyond challenge.[18] Nevertheless, judicial admissions must be read narrowly.[19]

While it is clear that judicial admissions are at issue in this case, the sole authority on which the Hilgendorfs rely to support their argument that the trial court had to rule on these admissions before trial, *People v Whitfield*,[20] is inapposite. In *Whitfield*, the Supreme Court held that

> upon motion in limine and offer of proof by the defense as to the nature of the proposed character testimony, the trial court must rule in advance of trial, where time allows, whether impeachment of the character witnesses by inquiry into specified unconvicted bad acts of the defendant will be permitted. This procedure will allow defense counsel to make a discriminating choice of the use of character witnesses and the appropriate scope of questioning.[21]

This rule specifically imposed requirements for admitting character evidence under MRE 404(a) in a criminal trial, not requests for admissions under the rules of civil procedure.

Ruling on this issue in advance of trial may have been prudent given the complex nature of the evidence and the simplifying effect admissions have.[22] However, the trial court had good cause to delay ruling on the motion. First, the trial court delayed ruling

---

[18] *Id.* at 420-421.

[19] *Id.* at 425.

[20] *People v Whitfield*, 425 Mich 116; 388 NW2d 206 (1986).

[21] *Id.* at 133.

[22] *Radtke, supra* at 420.

on the motion in October 1997 because it recognized that it did not understand the substance of the admissions and any dispute that might relate to them because they were in a form that was difficult to read. Ruling on the motion without understanding the supporting facts might have been an abuse of discretion in and of itself. Second, the trial court made it clear to the parties that it did not want to rule from the bench, evidently because of the number and complexity of the requests and responses. However, until after January 12, 1998, the only proposed order addressing the admissions was the first order proposed filed in fall 1997, which failed to identify the substance of the request for admissions and defendants' response. Thus, although the trial court could have resolved this issue much earlier in the proceedings, it did not abuse its discretion by waiting to be presented with an order that outlined the specific requests and responses that would be admitted at trial. Once it received an appropriate proposed order, the trial court acted relatively quickly to resolve the issue.

As for the effect that this delayed ruling had at trial, defendants have a marginally better argument. Requests for admissions and responses, especially responses admitting some relevant facts, are incapable of affecting the proceedings unless someone, whether the parties' attorneys or the trial court, informs the jury that certain facts have been admitted and they are conclusive. In this case, no one specifically informed the jury that defendants had admitted any conduct or facts and that their admissions had to be accepted as fact. However, the trial court's comments during closing arguments suggest that the

Hilgendorfs submitted the substance of these admissions to the jury in the form of exhibits. Indeed, unsigned copies of responses from the individual defendants appear among the exhibits submitted at trial in this case.

Furthermore, as defendants note, the witnesses testified consistently with the admissions. For instance, the Hilgendorfs claim that the critical admission was that "the fluid collection contained within Christopher's skull was, at least in part, inside the subdural space." Defendants' witnesses did not deny that there was fluid in Hilgendorf's subdural space. Rather, they testified that the injury that caused Hilgendorf's developmental delays occurred before he was born, it could have been caused by a virus, it was impossible to determine the nature of any fluid that may have accumulated in or around his brain, and no one could perform a subdural tap through the anterior fontanel to remove any fluid from where the plaintiffs claimed it had accumulated. Though the defense witnesses believed that there had been fluid filling a small hole in Hilgendorf's brain tissue, the admission did not state that fluid *only* accumulated in the subdural space, just that it had been in the subdural space "in part."

The vast majority of these admissions simply were not disputed at trial. For example, the defense witnesses all conceded that an NICU nurse had observed and recorded that Hilgendorf had exhibited half-open "sunset eyes." However, they challenged whether this was a symptom of intracranial pressure versus a sleepy baby who was awakening or a common occurrence among premature babies. Similarly, one of the admissions indicated that Hilgendorf had not under-

gone a spinal tap while at the hospital. Yet no one claimed that he had been treated with a spinal tap or that a spinal tap was even appropriate for his condition.

More importantly, once the trial court ruled regarding the motion to admit the admissions, the Hilgendorfs, through Silverman, did not attempt to use these admissions in any way that can be determined from the transcripts. For instance, even if Silverman believed that he could not object to defense testimony based on these admissions or attempt to impeach defense witnesses with these admissions until after the trial court entered the January 21, 1998, order, he did not attempt to use these admissions to affect the testimony in any way following the order. He did not take advantage of the trial court's offer to have him reopen proofs. Nor did he mention the admissions in his closing arguments. Whether by design or accident, these admissions did not play a role in the trial to any significant extent. Thus, any error in the trial court's delay in ruling on the motion to admit into evidence the responses to the request for admissions was harmless, not error requiring reversal.

### V. JURY INSTRUCTIONS

#### A. FACTS

Several times before the trial court instructed the jury in this case, the Hilgendorfs asked the trial court to give SJI2d 3.13, entitled "Fact Judicially Noticed," which simply states, "In this case, you [the jury] must accept it as fact that _____." Under the blank, in parentheses, SJI2d 3.13 informs the trial court to

"[i]dentify fact judicially noticed." Silverman requested that the trial court issue this order following closing arguments but before the instructions. The trial court responded:

> 3.13 is some fact judicially noted. What fact am I supposed to be judicially noting?
>
> *Mr. Silverman*: The admission.
>
> *The Court:* I don't take judicial notice of them. They are admissions and you made them an exhibit.
>
> *Mr. Silverman*: Okay.

On appeal, the Hilgendorfs argue that the trial court had an absolute duty to issue this instruction because it applied to the facts of this case. Thus, they claim, they are entitled to a new trial because the jury was not informed of the conclusive nature of these admissions. Defendants counter that there were no facts appropriate for judicial notice in this case, making the instruction inappropriate.

### B. STANDARD OF REVIEW

There is some dispute in the case law concerning what standard of review applies to instructional issues. However, the Supreme Court has most recently stated that review de novo is the standard of review that applies to "claims of instructional error."[23] A trial court may be entitled to some level of deference under the abuse of discretion standard of review if the decision to give or withhold a certain jury instruction depends on a factual determination, i.e.,

---

[23] *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000).

whether the evidence will support the instruction.[24] In any event, because the issue presented in this case is a pure question of law, the appropriate standard of review is review de novo.[25]

C. ANALYSIS

Regardless of whether admissions are the sort of facts ordinarily encompassed by the rule of evidence governing judicial notice,[26] the substance of SJI2d 3.13 was perfectly on point for the admissions in this case. Whether applied to admissions or facts judicially noticed, SJI2d 3.13 reflects the conclusive effect of both types of facts.[27] The trial court should have issued this instruction or one substantially similar to it. Instead, the trial court instructed the jury, as is routine, that the jury was to determine the facts of the case by considering direct and circumstantial evidence. The only time the trial court mentioned admissions to the jury was when it noted that an attorney's admission binds the attorney's client.

Nevertheless, two factors militate against concluding that this obvious error requires reversal. First, Silverman responded to the trial court's statement that the proper way to inform the jury of these admissions was to submit the responses as an exhibit by

---

[24] See *Isagholian v Transamerica Ins Corp*, 208 Mich App 9, 16; 527 NW2d 13 (1994).

[25] See *Cardinal Mooney High School v Michigan High School Athletic Ass'n*, 437 Mich 75, 80; 467 NW2d 21 (1991).

[26] MRE 201.

[27] See MCR 2.312(D)(1) ("A matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of an admission."); MRE 201(f) ("In a civil action or proceeding, the court shall instruct the jury to accept as conclusive any fact judicially noticed.").

saying "okay." He evidently did submit the responses to the jury. This can be interpreted reasonably as acquiescence and a waiver of the issue for appeal. As we have already stated, a party is not entitled to relief based on an issue that the party's attorney concluded was proper at trial.[28]

Second, giving the Hilgendorfs the benefit of the doubt concerning whether Silverman was withdrawing his insistence that the trial court issue this instruction, they still have not demonstrated how this error affected the jury's verdict. "The failure to give a properly requested, applicable, and accurate instruction does not require reversal unless the failure to vacate the jury verdict would be inconsistent with substantial justice."[29] As the previous analysis indicates, whether there was fluid in Hilgendorf's subdural space was not the critical question in this case. Even assuming that he had a classic subdural hematoma filled with fluid, the defense testimony at trial was that it was impossible to perform a subdural tap on him to drain the fluid because a physician would have to harm brain tissue to reach the place where the subdural hematoma existed. The jury must have believed this testimony because the Hilgendorfs' explicit theory of liability was that Drs. Relich and Rabbani had to perform a subdural tap to treat his condition and the jury still found that they were not negligent. Nor did the other admissions touch on disputed subjects that would have affected the jury's verdict. Thus, the error in failing to issue this instruction was harmless.

---

[28] *Dresselhouse, supra.*

[29] *Grzesick v Cepela*, 237 Mich App 554, 559; 603 NW2d 809 (1999).

VI. LEARNED TREATISE

A. FACTS

On cross-examination, Silverman asked pediatric neurosurgeon Benjamin Carson, M.D., one of the defense's expert witnesses, whether he had contributed to texts in pediatric intensive care. Dr. Carson said that he had contributed to several such texts. Silverman then asked whether Dr. Carson considered one of the texts that he had contributed to as "authoritative." Dr. Carson said that he did not consider any text authoritative

> because if you go back through medical history, and you look at the text books, you can find some pretty funny things, and as our knowledge increases, we begin to understand that what we may have thought was fact many years ago is in fact fallacy. So that's the reason that I do not refer to any medical text book as authoritative. But I do refer to it as a standard text, one that is widely utilized.

Silverman then pressed Dr. Carson regarding whether he thought that the text was a good source of information. Dr. Carson responded by talking about what the text substantively stated regarding subdural hematomas and the care that should be rendered. The trial court granted Silverman's request to strike Dr. Carson's last statement about the text, but told Silverman that the text, published in 1992, did not establish the standard of care for 1983. The trial court, however, agreed that Silverman could use the text to impeach Dr. Carson.

Silverman then began to question Dr. Carson regarding whether he had read several other texts, including a 1984 textbook on pediatrics by "Nelson." In each instance, Dr. Carson indicated whether he

had read or heard of the book and whether he considered it reliable. Concerning the book by Nelson, Silverman asked Dr. Carson whether he was aware of it:

> *Dr. Carson*: That sounds quite reasonable.
>
> *Mr. Silverman*: And this is a widely used text book in pediatrics; is it not?
>
> *Dr. Carson*: It is.
>
> *Mr. Silverman*: As a matter of fact, you're familiar with this from your curriculum at the University of Michigan; are you not?
>
> *Dr. Carson*: I am.
>
> *Mr. Silverman*: Do you consider this to be as of 1983 a reliable authority in the field of pediatrics?
>
> *Dr. Carson*: I would say I think it's a good textbook. One to which I would have no qualms referring someone.

When Arnone began redirect examination, he asked Dr. Carson whether he had ever treated a patient "based on a text book." Dr. Carson responded that he had never done so

> because text books don't take into account the individual situation. They talk about broad generalized circumstances. And they're really to be used by a person who has a good deal of education and experience so that you can integrate that information into your equation. It's not to be used as [a] bible.
>
> *Mr. Silverman*: In anticipation, I'm going to object if he even attempt[s] to re-enter portions of books now on redirect.
>
> *Mr. Arnone*: I think that the witness –
>
> *Mr. Silverman*: If he tries to do that –
>
> *Mr. Arnone*: My understanding, your Honor, is when a text book is called to a witness' attention on cross-examination, those portions that are relevant to that subject matter can be shown to the witness for the purposes of completeness and under that I would like to do that at this

time and I am going to do that. If there's an objection, that's fine.

*Mr. Silverman:* I have an objection. The rule states that this can only be used for impeachment on cross-examination. It's very specifically worded, cross-examination. I think it's also consistent with the importance of time here.

*The Court:* It says for impeachment purposes only. I wanted to make sure. Impeachment in Michigan is both impeachment pursuant to chapter six under the rules and rehabilitation. This is not substantially different, and we will allow it.

*Mr. Arnone:* Doctor, I would like to show you that portion of [the Nelson text] that talks about the utilization of a subdural tap for potentially draining bleeds such as hematoma?

*Dr. Carson:* Yes.

*Mr. Arnone:* Could you read that just to yourself, sir.

*Dr. Carson:* Okay.

*Mr. Arnone:* What does it say with regard to the utilization of a subdural tap with a potential for a subdural hematoma?

*Mr. Silverman:* Just to preserve my objection, your Honor, now the witness is reading from a book so it's being introduced as evidence and I don't believe that the rule allows for that. I just want to preserve my objection.

*The Court:* Counsel, I'm not sure what exactly you're doing and to encourage a witness to read from a text when I don't know where you're going is something I'm not going to let you do.

*Mr. Arnone:* Doctor, do you agree that the portion of Nelson's dealing with subdural taps indicates that the computerized tomographic CT scan of the head is a particularly sensitive method of diagnosing intracranial hemorrhage in [sic: and] neonatal ultrasonography may be similarly useful. Subdural taps, although occasionally valuable, are usually [not?] rewarding even in the presence of subdural hemorrhage since it is likely that the blood will have clotted. Do you agree with that statement in Nelson?

> *Dr. Carson*: That statement I would agree with. It's quite similar to what I was going to say.

Silverman did not object to this last question, and Arnone did not ask Dr. Carson any additional questions concerning the Nelson text.

On appeal, the Hilgendorfs contend that the trial court erred first when it ruled that MRE 707 permits learned treatises to be used during redirect examination to rehabilitate a witness and again when it permitted Arnone to read from the Nelson text to determine whether Dr. Carson agreed with it.

### B. STANDARD OF REVIEW

This Court ordinarily reviews preserved evidentiary issues for an abuse of the trial court's discretion[30] and unpreserved evidentiary issues to determine whether there was plain error affecting a party's substantial rights.[31] However, part of the present issue in this appeal requires the Court to interpret a rule of evidence, included in the court rules, making review de novo appropriate for that section.[32]

### C. ANALYSIS

MRE 707 states:

> To the extent called to the attention of an expert witness upon cross-examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history,

---

[30] *Fink, supra* at 458.

[31] *Meagher v Wayne State Univ*, 222 Mich App 700, 724; 565 NW2d 401 (1997), citing MRE 103(d).

[32] See *Waatti & Sons Electric Co v Dehko*, 230 Mich App 582, 586; 584 NW2d 372 (1998).

medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice, are admissible for impeachment purposes only. If admitted, the statements may be read into evidence but may not be received as exhibits.

The Hilgendorfs are not the first to argue that MRE 707 bars using learned treatises to rehabilitate an expert witness. In *Greathouse v Rhodes*,[33] a medical malpractice case, the plaintiff's attorney sought to use a learned treatise during direct examination of the plaintiff's expert witnesses in order to prove that their opinions were consistent with scientific principles.[34] The defendant objected that learned treatises could only be used to impeach a witness and the plaintiff did not intend to impeach with the learned treatises.[35] The trial court barred the plaintiff from using the learned treatises as intended.[36] On appeal, the plaintiff argued that learned treatises can be used to rehabilitate an expert witness. This Court, however, declined to address the issue because the plaintiff had not presented it properly and, instead, affirmed on other grounds.[37]

*Greathouse* came closer than any other case to addressing whether a learned treatise can be used for rehabilitation, but it did not solve the problem. *Greathouse* makes clear that MRE 707 prohibits a learned treatise from being used to "bolster" expert witness testimony on direct examination without con-

---

[33] *Greathouse v Rhodes*, 242 Mich App 221; 618 NW2d 106 (2000).

[34] *Id.* at 226.

[35] *Id.*

[36] *Id.* at 226-227.

[37] *Id.* at 238-240.

cluding in one fashion or another how else a learned treatise might be used.[38] MRE 707 does not explicitly make learned treatises admissible for rehabilitation. Ordinarily, the plain language of a court rule is the primary guide in its interpretation and application.[39] However, other cases interpreting and applying MRE 707 suggest that no matter how strict the prohibition against using learned treatises in direct examination of an expert witness may be, MRE 707 does not absolutely forbid using learned treatises at other stages of a trial or for other reasons.

For instance, in *Stachowiak v Subczynski*,[40] the Michigan Supreme Court gave MRE 707 a flexible meaning by holding that learned treatises cannot be used as substantive evidence in a case, but that they may used for other relevant, nonhearsay reasons that are not substantially more prejudicial than probative.[41] Similarly, in *Slocum v Ford Motor Co*,[42] the trial court admitted into evidence a copy of a newspaper article for the purpose of demonstrating that the article did not state what the witness claimed it stated despite the plaintiff's objection that admitting the arti-

---

[38] *Id.* at 239.

[39] See *Grievance Administrator v Underwood*, 462 Mich 188, 194; 612 NW2d 116 (2000) ("When that language [of a court rule] is unambiguous, we must enforce the meaning expressed, without further judicial construction or interpretation.").

[40] *Stachowiak v Subczynski*, 411 Mich 459, 464-465; 307 NW2d 677 (1981).

[41] See also *Fletcher v Ford Motor Co*, 128 Mich App 823, 829; 342 NW2d 285 (1983) ("By its decision [in *Stachowiak*], the Court in effect has rewritten rule 707, changing the phrase 'for impeachment purposes only' to 'for impeachment and nonhearsay purposes.' ").

[42] *Slocum v Ford Motor Co*, 111 Mich App 127, 137-138; 314 NW2d 546 (1981).

cle was improper impeachment.[43] On appeal, this Court noted that the trial court would have "defeat[ed] the fact finding purpose of trial" by obscuring the foundation for the expert witness' testimony.[44] Thus, the Court affirmed the trial court decision to admit the article, holding that "[f]undamental fairness dictates that the opposing party may admit, for impeachment purposes, the literature relied upon by an expert in forming his or her opinion."[45]

If *Slocum* can be interpreted to mean that fundamental fairness plays a role in how a trial court may permit parties to use learned treatises, then it is logical to conclude that when an adverse party impeaches an expert witness' testimony during cross-examination,[46] the party offering the expert witness may rehabilitate that witness during redirect examination using that same treatise. Consider, for example, a case in which the adverse party impeaches an expert witness using deceptively select portions of a learned treatise. Fairness would dictate that, following cross-examination, the offering party be allowed to ask the expert witness whether, perhaps, there was another section of the same learned treatise that supported the expert's opinion or if there were some reason why the passage at issue during cross-examination was not the basis for the expert's opinion. As the *Slocum*

---

[43] See MRE 707 ("If admitted, the statements may be read into evidence but may not be received as exhibits.").

[44] *Slocum, supra* at 139.

[45] *Id.*

[46] The support for the requirement that impeachment with a learned treatise first occur during cross-examination before a party may rehabilitate during redirect examination comes from the first sentence of MRE 707, which discusses how learned treatises may be used "[t]o the extent called to the attention of an expert witness upon cross-examination . . . ."

Court indicated, to allow partial and misleading testimony to go uncorrected works at cross-purposes with the jury's truth-finding function. To hold that an adverse party may use a learned treatise to impeach an expert witness during cross-examination without risk of contradiction by the party offering the witness' expert testimony would give the adverse party an unfair advantage in presenting evidence to the factfinder.

Further, by using a learned treatise to impeach a witness on cross-examination, the adverse party demonstrates an intention to dispute the issues surrounding that treatise, essentially waiving any objection to further questioning regarding those issues during redirect examination.[47] This is not to say that a party may use a learned treatise to rehabilitate an expert witness who was not impeached with the learned treatise during cross-examination. That would constitute the sort of unchallenged bolstering that this Court disapproved of in *Greathouse*.[48] Nor would an interpretation of MRE 707 that relied on fundamental fairness permit the scope of redirect testimony that rehabilitates an expert witness using a learned treatise to go beyond the scope of the cross-examination using the learned treatise. In other words, using a learned treatise to impeach an expert witness during cross-examination should not permit the party offering the expert's testimony to use the learned treatise for any purpose whatsoever during redirect examination.

[47] See, generally, *People v Lipps*, 167 Mich App 99, 108; 421 NW2d 586 (1988) ("Defendant cannot now be heard to complain regarding questions asked by the prosecutor on cross-examination when he himself 'opened the door' concerning such evidence in an effort to support his defense . . . .").

[48] *Greathouse, supra* at 239.

Generally, this interpretation would allow learned treatises to be used during redirect examination consistently with the way they were used to impeach during cross-examination.

Two other minor factors in the language used in MRE 707 are persuasive evidence that MRE 707 permits a learned treatise first used to impeach an expert witness during cross-examination to be used to rehabilitate the expert during redirect examination. First, when the Supreme Court drafted MRE 707, it wrote that learned treatises may be used for "impeachment purposes," not solely for impeachment during cross-examination by an adverse party. This language, while not definitely expressing an intent to permit learned treatises to be used during redirect testimony is consistent with MRE 607, which provides, "The credibility of a witness may be attacked by any party, including the party calling the witness." Thus, to read MRE 707 as limiting impeachment with a learned treatise to any particular phase of examination, direct, cross, or redirect, would impinge on the free form of impeachment expressly permitted under MRE 607. Accordingly, the pertinent question in applying MRE 707 to a case is not whether the allegedly improper use of a learned treatise occurred in redirect examination, the usual phase of questioning in which rehabilitation occurs. Rather, the pertinent question is whether the learned treatment was used for "impeachment purposes."

Second, "impeachment purposes" is an unusual turn-of-phrase for the Supreme Court to use in a court rule. If the Supreme Court had intended to limit using learned treatises solely to casting doubt on a witness' credibility, then it could have written MRE

707 to provide that learned treatises "are admissible for impeachment only." However, by using the word "purposes," the Supreme Court may have been signaling an intent to permit a broader context for the word "impeachment." *Random House Webster's College Dictionary* (1997) defines purpose as, "1. the reason for which something exists or is done, made, etc. 2. an intended or desired result; aim; goal. 3. determination; resoluteness. 4. the subject in hand; point at issue. 5. practical result or effect." This fourth definition is particularly telling. During rehabilitation, the impeachment that occurred during cross-examination is specifically "the subject in hand" or the "point at issue" even though the examiner's intention is to reconstruct, not malign, the expert witness' credibility. This also supports an interpretation of MRE 707 that would not allow a learned treatise to be used during redirect examination for anything other than rehabilitation.

Standing alone, the word "purposes" would not be enough to infer that the Supreme Court intended to allow learned treatises to be used to rehabilitate a witness during redirect examination. However, when analyzed along with the other factors identified here, especially the Supreme Court's decision not to limit the use of learned treatises to impeachment on cross-examination in *Stachowiak*, the word "purposes" is another tool that can be used to interpret MRE 707. Thus, we conclude that a learned treatise may be used to rehabilitate an expert witness during redirect examination on subjects or issues related to that treatise used to impeach the expert during cross-examination.

The trial court in this case did not err as a matter of law when it determined that Arnone could use a learned treatise to rehabilitate an expert witness during redirect examination. This is the interpretation we reach above. Applying this interpretation of MRE 707 to the facts of this case reveals that there was no error requiring reversal.

Silverman used the Nelson text to test Dr. Carson's knowledge and to determine whether he believed it authoritative, suggesting that Nelson provided medical standards and information that Dr. Carson believed were accurate. Though the primary purpose of cross-examining an adverse witness is to cast doubt on that witness' testimony, it is not clear that Silverman's questioning related to the Nelson text *actually* impeached Dr. Carson because he did not state that he disagreed with the Nelson text in any respect during cross-examination. Nevertheless, assuming that this benign questioning fit the definition of impeachment, Arnone's first question related to the Nelson text, while "rehabilitating" Dr. Carson, was, arguably, permissible because it clarified Dr. Carson's beliefs about relying on textbooks to make treatment decisions. This was related to Silverman's general purpose in bringing up the texts during cross-examination. To the extent that this is a close question—especially because it is not clear whether Silverman impeached Dr. Carson with the Nelson text—appellate courts ordinarily defer to the trial court's discretion and do not find error.[49] Further,

---

[49] See, generally, *People v Bahoda*, 448 Mich 261, 289; 531 NW2d 659 (1995), quoting *People v Golochowicz*, 413 Mich 298, 322; 319 NW2d 518 (1982) (" 'The decision upon a close evidentiary question by definition ordinarily cannot be an abuse of discretion.' ").

Silverman did not object to the question Arnone asked Dr. Carson regarding how he relied on textbooks generally, and this evidence neither advanced the defense nor wounded the plaintiffs' case. Thus, whether allowing Arnone to ask this question is not preserved for appeal, and there is no indication that any error, regardless of its plain nature, affected the Hilgendorfs' substantial rights.[50]

The Hilgendorfs also argue that the trial court erred in allowing Arnone to read to Dr. Carson from the Nelson text to determine if he agreed with its statement that a subdural tap was less effective at diagnosing a subdural hematoma. These questions may have fallen outside the scope of proper rehabilitation under a learned treatise because Silverman never asked Dr. Carson about that section of Nelson, much less impeached him with it. Nevertheless, the argument still lacks merit. The Hilgendorfs fail to acknowledge that the trial court stopped Arnone and admonished him in front of the jury that reading from the text was not proper. Further, Silverman did not object to the question Arnone asked Dr. Carson regarding whether he agreed with the statement in the text that subdural taps may not be effective at diagnosing subdural hematomas because blood may clot.[51] Even if allowing Arnone to read from the text or ask this last question was an error, the Hilgendorfs have not explained how this very brief exchange affected their substantial rights. In light of the extensive testimony in this case, which took approximately

---

[50] See MRE 103(a)(1).

[51] *Id.*

three weeks, this was unlikely to make the whole trial unfair. Thus, there was no error requiring reversal.

Affirmed.