*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JOAN MILLER, Personal Representative of the
ESTATE OF AARON KELLY MILLER,

       Plaintiff-Appellee,

v

ANGELS PLACE, doing business as ANGELS'
PLACE, INC., doing business as ANGELS' PLACE,
and CAROL CARAMIA,

       Defendants-Appellants.

UNPUBLISHED
December 17, 2024
11:57 AM

Nos. 365702; 365703
Oakland Circuit Court
LC Nos. 2018-165847-NI; 2020-
     181908-NH

JOAN MILLER, Personal Representative of the
ESTATE OF AARON KELLY MILLER,

       Plaintiff-Appellant,

v

ANGELS PLACE, doing business as ANGELS'
PLACE, INC., doing business as ANGELS' PLACE,
and CAROL CARAMIA,

       Defendants-Appellees.

Nos. 365986; 365989; 366143;
366145
Oakland Circuit Court
LC Nos. 2018-165847-NI; 2020-
     181908-NH

Before: YOUNG, P.J., and M. J. KELLY and FEENEY, JJ.

PER CURIAM.

This case arises out of the choking-related death of Aaron Miller at an adult foster care home. Miller's parents serve as the personal representative of his estate and brought a wrongful death action against Angels Place, the owner and operator of their son's care home, and Carol

-1-

Caramia, an employee thereof. In Docket Nos. 365702 and 365703,[1] defendants appeal as of right the judgment for plaintiff, awarding a total of $5,976,963.63 in damages and interest, which the trial court entered after a jury trial limited to the issue of damages. We affirm.

In Docket Nos. 365986 and 365989, plaintiff appeals as of right the opinion and order denying in part plaintiff's motion for discovery sanctions relating to electronically stored information (ESI), and awarding plaintiff $17,600 in attorney fees and costs. In Docket Nos. 366143 and 366145, plaintiff appeals as of right the order denying her motion for frivolous-defense sanctions. We affirm the denial of frivolous defense sanctions (Docket Nos. 366143 and 366145), but vacate the order regarding discovery sanctions and attorney fees and costs (Docket Nos. 365986 and 365989) and remand for further proceedings.

I. BACKGROUND

This wrongful-death case arises from the tragic death of Aaron Miller. Miller had intellectual disabilities and was a long-time resident of Joliat Home, one of 20 adult foster-care group homes owned and operated by Defendant Angels Place.[2] Defendant Carol Caramia was a direct-care worker assigned to care for the residents at Joliat Home.

On December 30, 2017, shortly before 4:00 p.m., Caramia was the only direct-care worker at Joliat Home. Miller was also present in the home. Caramia was in the kitchen, starting to prepare dinner for the residents. Miller came out of the back-bedroom area of the home and said, "help me[.]" He fell down in the kitchen and his arms and legs began twitching. Caramia called 911. She told the dispatcher that Miller had fallen down and his breathing was shallow. She stated, "I think he might be choking on something." Miller stood up, then started spitting a "frothy and white" substance out of his mouth. He began staggering around the house as Caramia told Miller repeatedly to sit down. According to Caramia, Miller told her that he was going to his room to go to bed. He looked scared and again stated, "help me." Caramia followed him while she remained on the phone with the 911 dispatcher. Miller went into his bedroom and collapsed. Caramia told the dispatcher that Miller had a "seizure problem" and stated, "[h]e's having seizures."

Several emergency medical personnel, including Commerce Township Fire Department Officer Roger Wilson, arrived at Joliat Home at approximately 4:07 p.m. At that point, Miller was unresponsive, and his face was turning blue. Officer Wilson testified at trial that he swept away something in Miller's mouth. Miller never regained consciousness and was pronounced dead the next day. The cause of death was deemed to be asphyxia and airway obstruction.

Before this litigation commenced, the Michigan Department of Licensing and Regulatory Affairs (LARA) and the Oakland Community Health Network Department of Recipient Rights

---

[1] This Court consolidated the appeals in Docket Nos. 365702, 365703, 365986, 365989, 366143, and 366145. *Miller Estate v Angels Place*, unpublished order of the Court of Appeals, entered May 24, 2023 (Docket Nos. 365702, 365703, 365986, 365989, 366143, and 366145).

[2] Angels Place is a non-profit company that was also doing business as Angels' Place, Inc. and Angels' Place.

(ORR) investigated the incident. The investigators learned that Miller's Individualized Plan of Care (IPOS) required Angels Place to follow certain rules, including cutting Miller's food into bite-sized pieces and monitoring him while eating. The direct-care workers also had to monitor Miller at least every five minutes.

The investigators also learned that Caramia had a recent history of performance issues at work. In early 2017, Caramia went on medical leave for a mental health crisis that followed the death of her mother. She had several restrictions placed upon her return, and was barred from passing medication, driving the residents, and cooking for the residents. No evidence exists that anyone disclosed to the investigators that Caramia suffered from a mental-health condition.

In May 2018, plaintiff filed this wrongful-death action, raising claims for ordinary negligence[3] against both defendants and breach of contract against Angels Place. Plaintiff's overarching theory of the case was that Caramia should not have been working alone, or at all, at Joliat Home, and that her conduct was a proximate cause of Miller's death.

During discovery, plaintiff requested documents regarding Caramia's job performance. On January 31, 2019, one of defendants' attorneys wrote a letter to plaintiff's counsel attaching several e-mails that Angels Place had not produced earlier in discovery. Those e-mails included e-mails from Caramia's direct supervisor, Ashley Gist, to her supervisors at Angels Place detailing Gist's recent frustrations with Caramia's job performance since her return from medical leave.

Plaintiff deposed several of Angels Place's representatives and the deponents were directed to bring e-mails[4] between the witness and anyone at Angels Place regarding Caramia. During those depositions, plaintiff obtained information about Caramia's performance problems and her poor 2017 annual appraisal. According to plaintiff, during the deposition of Angels Place program director Rosie Whitcher-Appel, she produced an e-mail, entitled "[O]n call report," which Angels Place had not produced earlier in discovery. The remaining deponents, however, did not produce responsive e-mails at their depositions. A lengthy ESI dispute followed.

At a September 2021 hearing, counsel discussed Angels Place's ESI and whether Angels Place had any remaining responsive documents. The trial court warned defense counsel that if

---

[3] Defendants moved for summary disposition under MCR 2.116(C)(7) and (C)(8) at the outset of the case, arguing that the case was a disguised medical malpractice case filed without taking the necessary procedural steps. The trial court agreed with defendants and dismissed the case. This Court reversed in a published opinion and the claims were reinstated. See *Miller Estate v Angels' Place, Inc*, 334 Mich App 325; 964 NW2d 839 (2020) (*Miller Estate I*). While awaiting the outcome in this Court, plaintiff filed a new medical malpractice case against Angels Place. Eventually, plaintiff amended the 2020 complaint to include an ordinary-negligence claim, and the medical malpractice claim was dismissed following *Miller Estate I*. The 2018 case and the 2020 case were consolidated in lower court.

[4] When a subpoena requires a person to bring documents or other materials to a deposition, it is called a deposition *duces tecum*. That phrasing is used in the remainder of this opinion.

Angels Place had not complied with the order to produce e-mails responsive to the discovery requests, then "there's going to be sanctions, severe sanctions." The court added:

> [Y]our clients are not to have a manual or automatic deletions [sic] of anything. All of that should have been frozen at the time, but certainly the Court does not want these things to be erased or deleted at this time, and all of those provisions should be in the stock room.

Later in discovery, plaintiff requested an ESI inspection and moved for discovery sanctions. In November 2021, the trial court ordered an ESI inspection with a joint expert named Larry Dalman. On the issue of sanctions, the court stated, "I want an order immediately to make sure that your clients are not deleting anything. I want you to provide them with that information. It should have been done long ago." Once again, the trial court explained that if documents existed that were responsive to the *duces tecum* deposition notices and were not produced, then, "there will be sanctions."

On December 8, 2021, defendants moved for summary disposition, arguing, in relevant part, that plaintiff could not establish that Angels Place engaged in negligent hiring or retention of Caramia because no evidence existed that Angels Place knew or should have known that Caramia was unable to supervise Miller. Shortly after, defendants requested emergency relief from the court's ESI order, indicating that Angels Place's information technology (IT) specialist, Mary Jo Allen, had experienced a medical emergency and was on leave. After Dalman was able to complete his investigation, an evidentiary hearing occurred in May 2022. In the evidentiary-hearing brief, plaintiff maintained that Dalman had uncovered thousands of relevant documents, while defendants explained in their brief that they did not produce these documents earlier because the uncovered documents were never requested, and no order had compelled their production.

During the evidentiary hearing, Dalman provided expert testimony about his ESI inspection. He explained that he was able to determine that someone at Angels Place had wiped two pink SanDisk flash drives clean intentionally using a specific software. He did not know what information had been on those drives. Dalman determined that more than 1,200 documents were deleted on December 8, 2021, the same day defendants filed their dispositive motion.

Dalman also sent the attorneys a report about the server for a computer that Angels Place maintained at Joliat Home. During his investigation, Dalman located several folders labeled "corporate," "confidential," and "Joliat Incidents," which had not been provided to plaintiff. Those folders were last modified on January 18, 2019, the same day defense counsel met with his client before he produced some responsive e-mails later that month. Dalman also testified that the computer was first used on January 12, 2018, just two weeks after Kelly's death and also a date that appeared as a time stamp on several uncovered e-mails.

Allen testified that any employee may use a flash drive, and Angels Place does not keep a record of information saved on a flash drive. When the flash drive is returned, Allen, or someone on her team, routinely deletes the information on it so it can be used again. However, Allen acknowledged that she was on medical leave on December 8, 2021, when the flash drives were deleted. Regarding the e-mails timestamped on January 12, 2018, Allen testified she was on

bereavement leave until January 13, 2018, so she was not aware of how that date came to be on the e-mails.

As the trial date approached, the parties filed several motions in limine, as discussed later. Because of the motions in limine, the court permitted plaintiff's forensic-pathology expert, Dr. Daniel Spitz, to testify at trial about Miller's conscious pain and suffering, provided that plaintiff laid a foundation for his expert testimony. The court also permitted the admission of the state-investigation reports at trial, finding that the documents fell within the business-records exception to the hearsay rule. But the court precluded admission of a statement within a 2011 emergency-room record suggesting that Miller had a history of seizures (which was defendants' theory of how Miller died), and precluded defendants from arguing that Miller could not perceive conscious pain and suffering in the same manner as an individual without intellectual disabilities. Following the hearing, the court permitted both parties to submit proposed findings of fact and conclusions of law.

In early June 2022, the court heard defendants' motion for summary disposition, which had been pending while the parties worked to resolve the ESI dispute. According to defendants, the court indicated off the record that it would deny the motion for summary disposition. On June 3, 2022, the Friday before the trial was scheduled to begin, at about 9:20 p.m., defendants filed an emergency motion in limine to limit the proofs to damages considering their recent "acknowledgment of responsibility." On appeal, defendants maintain that they were forced to acknowledge responsibility on the eve of trial because the court's delay in deciding key motions created uncertainty about the case. Defendants' decision to admit liability led to a dispute between the parties over whether plaintiff could present evidence at trial that might bear on the issue of fault.

On the day before trial, the trial court issued a detailed opinion and order denying defendants' motion for summary disposition. According to defendants, when they appeared for trial on June 6, 2022, the judge's clerk handed the parties an undocketed opinion and order on the motion for summary disposition; however, that interaction does not appear on the record. The court indicated that it would allow plaintiff to admit evidence at trial that might bear on the issue of liability and adjourned the trial to later that week.

That evening, the parties conducted the deposition of defendants' forensic-pathology expert, Dr. Ljubisa Dragovic, for possible use at trial, as he had a scheduled vacation. Following Dr. Dragovic's deposition, plaintiff moved to preclude admission of his testimony supporting his opinion that Miller had a seizure disorder and on whether Miller could have comprehended or appreciated his injury because of his intellectual disabilities. The court agreed with plaintiff on this issue and struck certain portions of Dr. Dragovic's deposition testimony.

Defendants then moved to disqualify the trial judge on the basis that she was biased or prejudiced against defendants and their attorney. Defendants noted several instances in which the trial judge had recently ruled against the defense, and also highlighted several statements the judge had made that defendants believed illustrated bias or prejudice. As discussed in more detail later, the trial court denied that motion and referred it to the chief judge, who reviewed the motion de novo and denied the motion as untimely. The trial was adjourned to late June 2022.

The trial on damages for conscious pain and suffering occurred over a two-day period in late June 2022. By that point, the parties had agreed to a joint statement of admitted liability, which was read into the record. Caramia and Wilson testified during the first day of trial. Dr. Dragovic and Dr. Spitz both testified live during the second day of trial.

During trial, the issue arose over whether Dr. Dragovic could testify about whether Miller could perceive conscious pain and suffering in the same manner as an individual without severe mental disabilities using scientific literature. The court concluded that Dr. Dragovic's testimony should be limited in the same manner as his deposition; this meant excluding the same portions of his live testimony.

During plaintiff's rebuttal closing argument, her attorney made the following statement:

> The best evidence is not Mr. Brownell's timeline, it's not my timeline, it's not our Power Points, it's that 911 tape. And you know what, you want to try to experience what he experienced, I don't have a clue if you guys have a coffee stirrers [sic] in the conference – in the jury room, put a coffee stirrer in your mouth –

Defense counsel objected on the basis that this was an improper "golden-rule" argument, but the court allowed the argument to continue. However, plaintiff's counsel did not continue to discuss the idea of the experiment in his rebuttal argument. It is not clear whether the jury performed the suggested experiment. However, the jury deliberated and reached a unanimous verdict that plaintiff was entitled to $5,344,000 in damages for Miller's physical pain and suffering, mental anguish, and fright and shock.

Following trial, the trial court issued a detailed opinion and order granting plaintiff's request for discovery sanctions for Angels Place's ESI violations. The court specifically noted that dates on which the deletion of certain documents occurred corresponded with key dates in this litigation, suggesting that the deletions were intentional. After this ruling, the case was reassigned from the original trial judge to the successor trial judge. Plaintiff filed a submission of costs and attorney fees for the discovery violations, which included plaintiff's counsel's requested hourly rate and number of hours. The parties disputed the hourly rate and the number of hours, and requested an evidentiary hearing. The successor judge entered the judgment in October 2022 without holding an evidentiary hearing.

Defendants moved for a new trial or to decrease the jury's damages award (remittitur), raising substantially the same arguments raised here on appeal. After initially transferring the motion to the original trial judge for consideration, the successor judge sua sponte reconsidered this decision and denied the motion for a new trial or remittitur without a hearing, explaining that the motion required insight into the credibility of the evidence presented to the jury, which the successor judge could not assess because she did not preside over the trial. Defendants then filed the appeals in Docket Nos. 365702 and 365703, appealing the jury's award.

The successor judge considered the motion for attorney fees and costs. Again, the court issued an opinion and order with conducting a hearing. The court ruled that while it did not condone Angels Place's behavior, plaintiff's requested fees were "exorbitant and unreasonable" both in terms of the requested hourly rates and the number of hours charged. The court ruled that

the sanctions should be limited to the amount needed to compensate plaintiff for having to file and appear for evidentiary hearings on multiple motions for sanctions relating to the ESI. The court awarded plaintiff $17,600 in attorney fees and costs.

Finally, plaintiff moved for frivolous-defense sanctions under MCL 600.2591. In lieu of hearing oral arguments, the court denied the motion "for lack of merit on the grounds presented." The appeals in Docket Nos. 365986, 365989, 366143, and 366145 followed and have since been consolidated with the jury verdict appeals in Docket Nos. 365702 and 365703.

## II. DOCKET NOS. 365702 AND 365703

### A. ATTORNEY MISCONDUCT

In Docket Nos. 365702 and 365703, defendants first argue that the jury verdict was the product of misconduct because of an improper statement plaintiff's counsel made during his rebuttal closing argument. We agree that the statement in question was improper, but conclude that it did not rise to the level of misconduct affecting the fairness of the trial.

We review the trial court's decision on a motion for a new trial for an abuse of discretion. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 761; 685 NW2d 391 (2004).[5] Additionally, we review the trial court's general conduct of the trial under an abuse-of-discretion standard. *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 302 Mich App 7, 21; 837 NW2d 686 (2013). "An abuse of discretion generally occurs only when the trial court's decision is outside the range of reasonable and principled outcomes . . . ." *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 604; 886 NW2d 135 (2016).

In general, a party must seek to cure an error at trial before the case is submitted to the jury for the issue to be preserved for appellate review. *Reetz v Kinsman Marine Transit Co*, 416 Mich 97, 101-102; 330 NW2d 638 (1982). However, "[w]here improper conduct by one or both parties influences the outcome of a trial, an appellate court may reverse although the appellant's attorney did not seek to cure the error." *Id*. at 102. In *Reetz*, the Michigan Supreme Court outlined the following three-step analysis for this Court to consider on appeal:

> When reviewing an appeal asserting improper conduct of an attorney, the appellate court should first determine whether or not the claimed error was in fact error and, if so, whether it was harmless. If the claimed error was not harmless, the court must then ask if the error was properly preserved by objection and request for instruction or motion for mistrial. If the error is so preserved, then there is a right to appellate review; if not, the court must still make one further inquiry. It must decide whether

---

[5] We note that the trial court did not address directly the arguments raised in defendants' motion for a new trial, and instead reasoned that the issues were too intertwined with the evidence submitted at trial. However, we may affirm the trial court's ruling when the trial court reached the correct conclusion, albeit for a different reason. See *Lane v KinderCare Learning Ctrs, Inc*, 231 Mich App 689, 697; 588 NW2d 715 (1998).

a new trial should nevertheless be ordered because what occurred may have caused the result or played too large a part and may have denied a party a fair trial. If the court cannot say that the result was not affected, then a new trial may be granted. Tainted verdicts need not be allowed to stand simply because a lawyer or judge or both failed to protect the interests of the prejudiced party by timely action. [*Id*. at 102-103.]

In this case, defense counsel made a contemporaneous objection when plaintiff's counsel suggested that the jury put the coffee stirrers in their mouth in the jury room. However, counsel argued that plaintiff's counsel was making an improper golden-rule argument, in violation of the principles outlined in *May v Parke, Davis & Co*, 142 Mich App 404, 423; 370 NW2d 371 (1985). There was no request for a curative instruction or a mistrial. Counsel later raised the objection of an improper experiment outside of the presence of the jury, but this objection was not contemporaneous. We deem the issue unpreserved. *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 359090); slip op at 2 (citation omitted). Therefore, as a result, to the extent that an error occurred, and that the error was not harmless, we will examine whether a new trial should be ordered because what occurred may have caused the result or played too large a part and may have denied defendants a fair trial. See *Reetz*, 416 Mich at 103.

The Michigan Supreme Court has explained that "[w]hile a lawyer is expected to advocate his client's cause vigorously, parties are entitled to a fair trial on the merits of the case, uninfluenced by appeals to passion or prejudice." *Bd of Co Road Comm'rs of Wayne Co v GLS LeasCo, Inc*, 394 Mich 126, 131; 229 NW2d 797 (1975) (quotation marks and citation omitted). An attorney's comments during trial normally do not constitute grounds for reversal, unless those comments demonstrate a deliberate attempt to deprive the opposing party of a fair and impartial trial. *Carlsen Estate v Southwestern Mich Emergency Servs, PC*, 338 Mich App 678, 697; 980 NW2d 785 (2021).

In *Reetz*, 416 Mich at 98-99, the Michigan Supreme Court addressed the defendant's allegation that the plaintiff's counsel made several improper comments during a personal-injury trial. At trial, the plaintiff's counsel made comments regarding the defendant's ties to George Steinbrenner III, the owner of the New York Yankees. *Id*. at 99, 110. The plaintiff's counsel argued during his closing argument that the defendant was engaged in a coverup and that its witnesses had committed perjury. *Id*. at 107. The plaintiff's counsel added that the defendant (a company) did not care about the plaintiff's welfare, and that the defendant could afford "the best of everything." *Id*. at 110. On appeal, the Michigan Supreme Court concluded, "[t]he effect of these comments was to create in the minds of the jurors an image of [the defendant] as an unfeeling, powerful corporation controlled by a ruthless millionaire." *Id*. at 111. Additionally, the Court explained while these isolated comments are always improper, they may not always be incurable or require reversal. *Id*. "[W]hen, as in this case, the theme is constantly repeated so that the error becomes indelibly impressed on the juror's consciousness, the error becomes incurable and requires reversal." *Id*.

The present case lacks that repetition and incurability; the error here was harmless. We certainly agree with defendants that counsel's statement was an improper suggestion that the jurors

conduct their own experiment in the jury room, which would violate the jury instructions. However, this one instance of error does not demonstrate a pattern of misconduct designed to deprive defendants of a fair and impartial trial. To start, plaintiff's counsel was not able to finish his statement suggesting that the jurors use coffee stirrers to mimic the "air-hunger" event that Miller may have experienced before his death. Defense counsel interrupted the rebuttal closing argument with an objection. Once defense counsel placed his objection on the record, plaintiff's counsel did not resume his argument that the jurors should conduct an experiment in the jury room and instead reminded the jurors that they could not consider outside information.

Furthermore, the idea of the coffee stirrers was first mentioned during Dr. Spitz's testimony, when plaintiff's counsel questioned him as follows:

> *Q*. If someone was to breathe through a coffee stirrer, for example, would that give the sensation of having airflow decrease to kind of what a partial obstruction would be?

> *A*. I suppose if you–if you could do that you wouldn't–you wouldn't maintain yourself all that long, because again, that would not be an efficient and effective way to have, you know, to be able to oxygenate your entire body. But, yeah, of course–but of course the minute you start to get a little bit where it's not working, you know, you're going to go back to breathing normally, but I–but I guess if you can envision the process by which you can't go back to breathing normally and you have to continue breathing through a limited–limited straw or what have you, then yeah, that–that would be sort of an experiment that you can do, yeah.

Defense counsel did not object to this line of questioning. Therefore, the jury already knew from Dr. Spitz's testimony that breathing through a coffee stirrer would give a similar feeling to having a partial airway obstruction. Also, there is no evidence that the jurors conducted the experiment in the jury room. For these reasons, the statement, though inappropriate, had limited effect on the jury and was harmless.

Importantly, the trial court also gave several curative instructions that addressed any minimal prejudicial effect of the improper comment. See *Zaremba*, 302 Mich App at 25 (" 'Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors.' ") (citation omitted). The trial court instructed the jurors twice to decide the issue of damages using the evidence and avoid basing the verdict on passion, prejudice, sympathy, or bias. Later that day, the court instructed the jury that the lawyers' statements, commentary, and arguments are not evidence. The court also informed the jurors: "Research, investigations, and experiments not admitted into the courtroom are not evidence. You must not go [sic] any investigations on your own or conduct any research, experiments of any kind."

Finally, even assuming the error was not harmless, because the issue is unpreserved, we must also examine whether a new trial should be ordered because what occurred may have caused the result, or played too large a part and may have denied defendants a fair trial. See *Reetz*, 416 Mich at 103. On this topic, defendants suggest that plaintiff's counsel always intended to present the experiment idea to the jury during his rebuttal closing argument. But even assuming counsel's

suggestion to the jury was planned, that fact would not change that the comment was isolated and had minimal influence on the trial. In other words, this case does not present a situation where a single improper comment became incurable because it was "indelibly impressed on the jurors' consciousness." See *id*. at 111. The trial court correctly concluded defendants are not entitled to a new trial.

## B.  BIAS AND PREJUDICE

Defendants next argue that the trial court abused its discretion by denying their motion for a new trial because the verdict was the product of the improper influence of passion or prejudice, and because the verdict was excessive. We disagree.

The question whether judicial misconduct deprived the appellant of a fair trial is a constitutional-law question that we review de novo. See *People v Stevens*, 498 Mich 162, 179 n 5, 180; 869 NW2d 233 (2015) (indicating the same general standard applies in civil cases as well). Regarding whether the verdict was excessive, we review that issue for an abuse of discretion. *Diamond v Witherspoon*, 265 Mich App 673, 692; 696 NW2d 770 (2005).

As our Supreme Court has explained, the task of determining whether the damages were excessive "is not a simple task," and the calculation of damages required to compensate a party for pain and suffering is imprecise and usually reserved for the jury. *Gilbert*, 470 Mich at 763-764. The role of the reviewing court is to ensure "that a verdict is not 'excessive' without concomitantly usurping the jury's authority to determine the amount necessary to compensate an injured party." *Id*. at 764. There is no precise algorithm for this review, and this Court must consider that the reason behind compensatory damages is to compensate the injured party for losses proven in the trial record. *Id*. This Court must consider the following three factors:

> [(1)] whether the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact; [(2)] whether the verdict was within the limits of what reasonable minds would deem just compensation for the injury sustained; [and (3)] whether the amount actually awarded is comparable to awards in similar cases within the state and in other jurisdictions. [*Id*. (alterations in original), quoting *Palenkas v Beaumont Hosp*, 432 Mich 527, 532-533; 443 NW2d 354 (1989).]

As demonstrated by these three factors, known as the *Palenkas* factors, when the verdict is the result of improper advocacy methods, misleading arguments, or other factors that affect the jury's ability to quantify the plaintiff's injuries, the damages award becomes inherently unreliable. *Gilbert*, 470 Mich at 764. Similarly, when the verdict is not supported by the record or is "entirely inconsistent" with verdicts in similar cases, the appellate court may conclude the verdict is excessive. *Id*. at 765.

### 1.  PASSION OR PREJUDICE-COUNSEL

Beginning with the first *Palenkas* factor, defendants argue that the verdict was the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact caused by the conduct of either plaintiff's counsel or the trial court. We disagree.

Defendants rely on the Michigan Supreme Court's opinion in *Gilbert* to support their position. In *Gilbert*, the Michigan Supreme Court addressed whether a jury verdict was the result of passion and prejudice because the plaintiff's counsel "had repeatedly equated [the] plaintiff's experiences to those of the victims of the Holocaust, and thereby associated [the] defendant's new German co-owners with the Nazis who perpetrated that horror." *Id*. at 762. *Gilbert* was a sexual-harassment lawsuit that involved a then-unprecedented $21 million jury-verdict award. *Id*. at 753. The plaintiff remained employed by the defendant at the time of trial, but claimed that the sexual harassment permanently changed her brain chemistry. *Id*. at 753, 759-760. The Michigan Supreme Court agreed with the defendant that the large verdict was the result of the jury's passion and prejudice, which was inflamed through "prejudice-baiting rhetoric." *Id*. at 755. The plaintiff's counsel made other improper remarks, such as equating the plaintiff with a dog that was physically abused. *Id*. at 773. The Michigan Supreme Court held that the trial court ignored how prominent the attorney's prejudicial remarks were and the effect those remarks had on the jury. *Id*. at 778.

This situation is factually distinguishable from *Gilbert*. As discussed earlier, counsel's statement was an isolated instance of error that did not permeate the trial with prejudice-baiting rhetoric, like what occurred in *Gilbert*. This was not a situation where plaintiff's counsel made repeated statements throughout trial comparing defendants to immoral individuals or regimes. Moreover, *Gilbert* was a sexual harassment lawsuit where the plaintiff was still employed by the defendant and where the trial resulted in an eight-figure jury award. In contrast, this case was a wrongful-death lawsuit in which the decedent died after an episode of choking that lasted at least eight minutes and resulted in a seven-figure award. Finally, for the reasons discussed in Issue A, there is no indication that the isolated statement during the rebuttal closing argument deprived defendants of a fair trial, particularly considering the trial court's cautionary jury instructions.

## 2. PASSION OR PREJUDICE-JUDICIAL BIAS

Next, defendants argue that the trial court made a mistake of law and exhibited bias when the court permitted plaintiff to present evidence at trial bearing on the issue of liability, which defendants argue led them to agree to a detailed stipulation of admitted liability. Once again, we disagree.

Defendants admitted liability before trial. In a motion in limine to prevent admission of evidence bearing on liability, filed on the eve of trial, defendants stated that they "have elected to acknowledge responsibility in this matter so that the only matter that will [be] left to be decided by the jury is damages." When the parties appeared for the June 6, 2022 trial date, the issue of the admission of liability was discussed before the jury entered the courtroom. The trial court denied the motion in limine to the extent that defendants requested the exclusion of any evidence that might bear on negligence, explaining that "the evidence with regard to any type of negligence or anything of that matter is going to remain the same." When defense counsel argued that it was "error" to admit evidence on liability when liability was admitted, the trial court responded as follows:

> Sir, the inappropriate purpose, sir, would be that this was filed the Friday evening, as you said, as a tactical matter, sir. This is after we've had significant issues with regard to electronic discovery, issues with regard to the deletion of the discovery, issues with regard to the production, making sure that everything was done.

-11-

The court concluded that if the parties agreed to a joint statement of admitted liability, then the joint statement could be submitted to the jury for consideration.

The court distilled its ruling in a written opinion and order, where the court reasoned that defendants had not yet made a record of their admission of liability but had made "merely a blanket admission," which defense counsel had characterized as a "judicial admission." The court cited favorably to plaintiff's argument that a party cannot be forced to accept his adversary's admission in lieu of presenting evidence at trial.

The trial court's ruling did not arise from bias or prejudice against the defense. Putting the ruling into perspective, defendants admitted liability on the eve of trial and after a lengthy ESI dispute where the parties' joint expert discovered thousands of documents that defendants had withheld or destroyed. Furthermore, as the court noted, while defendants had announced their intent to "acknowledge responsibility," they did not place that admission on the record or explain the contours of the admission until the parties agreed on a joint statement of liability.

The caselaw supports the trial court's ruling that plaintiff could admit evidence bearing on liability despite defendants' vague admission of responsibility on the eve of trial. Judicial admissions should be construed narrowly. *Hilgendorf v St John Hosp & Med Ctr Corp*, 245 Mich App 670, 690; 630 NW2d 356 (2001). Judicial admissions are "formal concessions in the pleadings in the case or stipulations by a party or its counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Id*. at 689 (quotation marks and citations omitted). In this case, defendants indicated they were "acknowledging responsibility" for the incident on the eve of trial, but did not specify what facts they were admitting or the contours of their admission on liability (i.e., whether the admission encompassed both breach of duty and causation). The trial court prevented the question of liability from reaching the jury, but did not limit the scope of evidence presented at trial.

It is true that "[w]here the testimony as to a fact is not disputed, the jury should be instructed to find it accordingly." *Holbert v Staniak*, 359 Mich 283, 290; 102 NW2d 186 (1960); *Richardson v Coddington*, 45 Mich 338; 7 NW 903 (1881). However, it is a longstanding principle of Michigan law that "[a] party can never be compelled to accept his adversary's admission in lieu of record evidence unless he chooses . . . ." *John Hancock Mut Life Ins Co v Moore*, 34 Mich 41, 42-43 (1876). The trial court correctly concluded that plaintiff could not be forced to accept defendants' admission of responsibility in lieu of presenting record evidence. The court's ruling had a basis in fact and law and did not demonstrate bias.

### 3. VERDICT UNSUPPORTED BY RECORD

Next, as it relates to the second *Palenkas* factor, defendants argue the verdict was excessive and did not fall within the limits of what reasonable minds would consider just compensation for Miller's injuries. We again disagree.

The Michigan Supreme Court has explained that the second *Palenkas* factor examines whether the verdict was supported by the record. *Gilbert*, 470 Mich at 766. On the issue of conscious pain and suffering, MCL 600.2922(6) provides that in a wrongful-death action, the plaintiff may recover "reasonable compensation for the pain and suffering, while conscious,

undergone by the deceased during the period intervening between the time of the injury and death[.]" " 'The existence of a decedent's conscious pain and suffering may be inferred from other evidence that does not explicitly establish the fact.' " *Klinke v Mitsubishi Motors Corp*, 219 Mich App 500, 514; 556 NW2d 528 (1996) (citation omitted). In *Klinke*, this Court held that the plaintiff had presented evidence from which the jury could have inferred that the decedent experienced conscious pain and suffering on the basis of the defendant's expert testimony that the decedent suffered a fatal head injury during the accident, and that she suffered a " 'significant injury.' " *Id.* at 514-515.

The jury awarded plaintiff damages in the amount of $5.344 million as reasonable compensation for the following categories of damages that Miller experienced for the 8 to 10 minutes that he was conscious: "physical pain and suffering," "mental anguish," and "fright and shock." Defendants argue that plaintiff's proof on the issue of damages was limited to the 911 audio recording and the testimony of two witnesses—Caramia and Wilson. For Caramia, defendants argue that her testimony on the issue was limited to her observation that Miller "looked scared." However, defendants overlook that Caramia testified about Miller's life before the accident, agreeing with plaintiff's counsel that Miller was a "cool dude" who loved airplanes and the game of golf, and who had "a good sense of humor." Caramia also testified that during the incident, Miller came out of the back-bedroom area of the home and said, "help me" twice. Miller's statement supports that he was aware he was in trouble and needed assistance.

Defendants are also critical of Dr. Spitz's testimony, arguing that he did not quantify the level of noneconomic damages that Miller experienced, leaving the jury to speculate that Miller experienced the incident in the same way that a "neurotypical person" would under the circumstances. However, Dr. Spitz testified that Miller's request for help indicated that Miller knew he needed help and was aware of his situation. Dr. Spitz later testified that, even with his intellectual disabilities, Miller would have experienced "stress and panic" from the point he had the sensation that he could not breathe up until the time he became unconscious. Dr. Spitz confirmed that Miller would have experienced "some physical pain," and that the primary emotions he would have experienced were fear, anxiety, stress, and panic. He opined that this period "was probably at least eight minutes or more" but that it was "hard to know the exact timeframe." In fact, even defendants acknowledge in their brief on appeal that Miller underwent "respiratory distress" for "10 or less minutes." And Dr. Dragovic also testified that Miller experienced distress during the incident. This evidence supported that Miller experienced conscious pain and suffering.

Defendants are also critical of the evidentiary value of the audio recording of the 911 call, arguing that there was no evidence to support that any of the background sounds heard in the recording were Miller choking. However, even assuming the background noises did not come from Miller, the 911 recording was a compelling piece of evidence. Not only did the 911 recording provide an indication on the length of time Miller was suffering, but the recording also demonstrated the severity of the situation. Caramia was audibly upset during the call. She repeatedly told the dispatcher to send help immediately, told Miller on numerous occasions to "keep breathing," and prayed over Miller's body when he became unconscious.

In sum, the evidence presented at trial, including Caramia's testimony, Dr. Spitz's testimony, and the recording of the 911 call, supported that Miller underwent conscious pain and suffering for about eight minutes before he became unconscious. We cannot fairly conclude that the verdict exceeded the amount required to compensate for Miller's pain and suffering.

## 4. EXCESSIVE VERDICT

Regarding the third *Palenkas* factor, defendants also argue that the verdict was not comparable to the amounts awarded in similar cases within Michigan and other jurisdictions. We again disagree.

In *Gilbert*, 470 Mich at 767, the Michigan Supreme Court explained that the key issue is whether the verdict went beyond the range of what other juries determined to be reasonable compensation. On this issue, this Court has held that " '[a]n appellate court should not attempt to reconcile widely varied past awards for analogous injuries which in the abbreviated appellate discussion of them seem somewhat similar.' " *Freed v Salas*, 286 Mich App 300, 336; 780 NW2d 844 (2009) (quotation marks and citation omitted; alteration in original).

Plaintiff presents six illustrative verdicts to this Court, all of which involved mid-seven-figure damages awards for conscious pain and suffering in the context of a choking death. However, none of those cases are from Michigan. Of those verdicts, several are well into the seven figures and involved deaths involving vulnerable individuals and choking deaths. In contrast, defendants present 13 cases that they argue are comparable to this case, and in which the juries awarded damages in the six figures or the lower seven figures for choking deaths, primarily in the nursing-home context. Taking these comparable verdicts into consideration, the verdict here was not grossly excessive. The verdict is within the range of what other juries had deemed to be reasonable compensation for similar injuries, albeit on the higher end of that range. Because the amount awarded is comparable to awards in similar cases, we cannot conclude that the verdict was excessive.

## C. REMITTITUR

Defendants next argue that the trial court abused its discretion by denying their request for remittitur because the verdict was grossly excessive. We disagree.

We review a trial court's decision on a remittitur request for an abuse of discretion. *Diamond*, 265 Mich App at 692-693. "Remittitur is justified when a jury verdict exceeds the highest amount the evidence will support." *Id*. at 694. Remittitur requires an examination of whether the verdict was the result of "improper methods, prejudice, passion, partiality, sympathy, corruption, or mistake of law or fact, whether it was within the limits of what reasonable minds would deem to be just compensation for the injury inflicted, and whether the amount actually awarded is comparable to other awards in similar cases." *Id*. Additionally, "[w]hen reviewing such motions, this Court views the evidence in the light most favorable to the nonmoving party, giving due deference to the trial court's decision because of its ability to evaluate the credibility of the testimony and evidence presented to the jury." *Landin v Healthsource Saginaw, Inc*, 305 Mich App 519, 546; 854 NW2d 152 (2014).

The analysis on this involves considerable overlap with the analysis of the second and third *Palenkas* factors outlined earlier. For the reasons discussed earlier, the verdict was not the result of improper methods, prejudice, passion, partiality, sympathy, corruption, or a mistake of law or fact. And the verdict was not excessive considering the evidence presented at trial and the comparable jury-verdicts. Remittitur is not warranted.

## D. EXPERT TESTIMONY AND JURY INSTRUCTIONS

### 1. DR. DRAGOVIC'S TESTIMONY

Defendants first argue in relation to their evidentiary challenge that the trial court erred by limiting the scope of Dr. Dragovic's trial testimony. We disagree.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Craig ex rel Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004). Any error in the admission of evidence does not warrant appellate relief unless the appellant can establish that the failure to act would be inconsistent with substantial justice or affects a substantial right of the appellant. See *id*. Regarding defendants' challenge to the jury instructions, we review the issue de novo. *Lewis v LeGrow*, 258 Mich App 175, 211; 670 NW2d 675 (2003). We review for an abuse of discretion a trial court's ruling on whether a jury instruction applies in a case and is accurate. *Id*.

The issue centers on whether Dr. Dragovic's testimony was the product of reliable principles and methods. A trial court considering the admission of expert testimony under MRE 702 acts as a gatekeeper and has the responsibility to ensure the testimony is relevant and reliable. *People v Lemons*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket No. 163939); slip op at 13. The proponent of the evidence must establish the relevance and admissibility of the evidence. *Id*. at ___; slip op at 13. For purposes of MRE 702, the court must focus on the principles and methodology employed by the expert, and not on the conclusions generated by the principles and methodology. *Id*. at ___; slip op at 13. The proponent of the expert testimony must " 'show that any opinion based on those data expresses conclusions reached through reliable principles and methodology.' " *Id*. at ___; slip op at 13-14 (quotation marks and citation omitted). " '[W]hen evaluating the reliability of a scientific theory or technique, courts consider certain factors, including but not limited to whether the theory has been or can be tested, whether it has been published and peer-reviewed, its level of general acceptance, and its rate of error if known.' " *Id*. at ___; slip op at 14 (citation omitted). The Michigan Supreme Court has recently reaffirmed, in the context of a medical malpractice case, that the use of peer-reviewed, published literature is not always necessary or sufficient to establish the requirements outlined in MRE 702, particularly when the situation is so rare that there is no supportive literature available. *Danhoff v Fahim*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket No. 163120); slip op at 2-3. However, the lack of supporting literatures remains "an important but not dispositive factor." *Id*. at ___; slip op at 17.

Here, Dr. Dragovic's testimony was taken by deposition in advance of trial because he may have been unavailable to testify in person due to a scheduled vacation. Because of this arrangement, by the time of trial, the court had already deemed portions of this expert's testimony inadmissible under MRE 702 and MCL 600.2955(1) for a lack of supporting literature.

Maintaining those same exclusions on Dr. Dragovic's in-person testimony was not an abuse of discretion.

As our Supreme Court recently noted, the lack of supporting literature and any other form of support for an expert's opinion will render that opinion unreliable under MRE 702. *Danhoff*, ___ Mich at ___; slip op at 17-18. Dr. Dragovic relied solely on his background and experience, "which is generally not sufficient to argue that an expert's opinion is reliable." *Id*. at ___; slip op at 19 (quotation marks and citation omitted). Defendants did not provide any information in advance of trial supporting the factors outlined in MCL 600.2955(1). See MCL 600.2955(1); MRE 702. Therefore, the trial court did not abuse its discretion by prohibiting Dr. Dragovic's testimony regarding whether Miller had a seizure causing his death, or whether Miller would have experienced less conscious pain and suffering because of his intellectual disabilities.[6]

## 2. JURY INSTRUCTIONS

Next, defendants argue the trial court erred in relation to M Civ JI 17.01 and in relation to the modifications to M Civ JI 45.01 and M Civ JI 45.02. We disagree.

"The trial court's jury instructions must include all the elements of the plaintiffs' claims and should not omit any material issues, defenses, or theories of the parties that the evidence supports." *Lewis*, 258 Mich App at 211. "If, on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury, no error requiring reversal occurs." *Id*. Reversal is warranted only when the failure to do so would be inconsistent with substantial justice. *Id*. at 211-212.

Defendants first argue that the trial court erred in relation to the application of M Civ JI 17.01, which relates to an admission of liability by the defense. M Civ JI 17.01 provides:

The defendant has admitted that [ he / she ] is liable to the plaintiff for any [ injury / damages ] which [ he / she ] caused. You are to decide only (what [ injuries / damages ] were caused by defendant and) the amount to be awarded to the plaintiff for such [ injury / damages ]. [Alteration omitted.]

The Comment to this jury instruction adds: "The jury should not be permitted to consider the question of liability where it has been admitted. It is reversible error to submit any issue to the jury which has not been questioned or has been admitted. *Richardson v Coddington*, 45 Mich 338; 7 NW 903 (1881); *Holbert v Staniak*, 359 Mich 283; 102 NW2d 186 (1960)." M Civ JI 17.01, Comment.

---

[6] Defendants do not present the evidence on which they would have relied at trial to support Dr. Dragovic's opinion. "A party may not simply announce a position and leave it to this Court to make the party's arguments and search for authority to support the party's position." *Seifeddine v Jaber*, 327 Mich App 514, 519; 934 NW2d 64 (2019).

The trial court instructed the jury as follows: "The Defendants have admitted liability; that they are liable to the Plaintiff for any injuries, damages which they caused. You are to decide only the amount to be awarded to Plaintiff for such injuries and damages." While the language of the instruction differed slightly from the standard language in M Civ JI 17.01, the content of the instruction is essentially the same. Defendants argue that the trial court erred by ruling that, either plaintiff could admit at trial the evidence supporting liability or the parties would have to agree on a joint statement of liability. Defendants cite the Comment to M Civ JI 17.01 in support of their argument.

However, as discussed earlier, the trial court correctly concluded that plaintiff could not be forced to accept defendants' vague admission of responsibility in lieu of presenting evidence bearing on liability at trial, particularly when the parties had not yet agreed to a joint statement that outlined the scope of the admission. The court concluded that the question of liability was no longer on the table, which was in line with the Comment to M Civ JI 17.01. No error occurred in relation to this jury instruction.

Next, defendants argue the trial court erred by accepting plaintiff's version of M Civ JI 45.01, which omitted the final two sentences relating to the real parties in interest. Before trial, defendants advocated for a version of M Civ JI 45.01 that would have informed the jury of the names of the members of Miller's Estate and provided, "They are the real parties in interest in this lawsuit and in that sense are the real plaintiffs, whose damages you are to determine if you decide for the personal representative of the estate of Aaron Kelly Miller." The trial court's jury instruction omitted information about the members of Miller's Estate. The omission of this information did not prejudice the defense, particularly where defense counsel argued that the personal representative should not become a multimillionaire because of this action. He later asked the jury to consider "why is that something that should be paid to the estate to compensate for something that happened back in 2017 and paid over today for that event[?]" Defendants had the opportunity to argue that the money would be awarded to Miller's Estate. The idea that plaintiff may be the only person who stood to benefit from the lawsuit was a fact that defendants used to their advantage at trial. Therefore, even assuming the omission of the information about the members of the Estate was an error, reversal is not warranted because the change did not affect the outcome of trial.

Finally, defendants challenge the trial court's instruction on wrongful-death damages. M Civ JI 45.02 provides, in relevant part:

> If you decide the plaintiff is entitled to damages, you shall give such amount as you decide to be fair and just, under all the circumstances, to those persons represented in this case. Such damages may include the following items, to the extent you find they have been proved by the evidence:
>
> * * *
>
> (2) *(reasonable compensation for the pain and suffering undergone by [ name of decedent ] while [ he / she ] was conscious during the time between [ his / her ] injury and [ his / her ] death)

-17-

* * *

Which, if any, of these elements of damage has been proved is for you to decide, based upon evidence and not upon speculation, guess, or conjecture. The amount of money to be awarded for certain of these elements of damage cannot be proved in a precise dollar amount. The law leaves such amount to your sound judgment. Your verdict must be solely to compensate for the damages and not to punish the defendant.

The Comment to M Civ JI 45.02 provides, in relevant part, "Where appropriate, elements of damages such as those listed in M Civ JI 50.02 may be inserted into this instruction." M Civ JI 50.02 directs the court to insert any of the enumerated elements relating to the damages for pain and suffering that are applicable to the circumstances of the case. These elements include physical pain and suffering, mental anguish, and fright and shock among others.

Defendants do not address M Civ JI 50.02 in their brief on appeal and instead argue that the modification to allow for categories of damages (physical pain and suffering, mental anguish, fright and shock) did not properly inform the jury of the applicable law. However, defendants overlook that the jury instructions expressly permit this modification by incorporating M Civ JI 50.02. See *Taylor v Mich Power Co*, 45 Mich App 453, 457; 206 NW2d 815 (1973) (holding in a wrongful-death action that the trial court did not err by adding the words "mental anguish, "fright," and "shock" to the jury instruction about conscious pain and suffering) (quotation marks omitted). Considering this authority, the trial court had discretion to allow the addition of the categories of conscious pain and suffering. Therefore, the trial court did not commit a legal error in relation to the jury instructions.

## E. DEFENDANTS' MOTION TO DISQUALIFY

Defendants also argue that the original trial judge who oversaw the trial demonstrated bias and an appearance of impropriety throughout the proceedings and particularly leading up to the trial. We disagree.

"In reviewing a motion to disqualify a judge, this Court reviews the trial court's findings of fact for an abuse of discretion and reviews the court's application of those facts to the relevant law de novo." *In re Contempt of Henry*, 282 Mich App 656, 679; 765 NW2d 44 (2009). Regarding the procedure for moving to disqualify the trial judge, MCR 2.003(D) provides in relevant part:

(1)(a) To avoid delaying trial and inconveniencing the witnesses, all motions for disqualification must be filed within 14 days of the discovery of the grounds for disqualification. If the discovery is made within 14 days of the trial date, the motion must be made forthwith.

* * *

(d) Untimely motions in the trial court, the Court of Appeals, and the Supreme Court may be granted for good cause shown. If a motion is not timely

-18-

filed in the trial court, the Court of Appeals, or the Supreme Court, untimeliness is a factor in deciding whether the motion should be granted.

(2) In any motion under this rule, the moving party must include all grounds for disqualification that are known at the time the motion is filed. An affidavit must accompany the motion.

(3)(a) For courts other than the Supreme Court, the challenged judge shall decide the motion. If the challenged judge denies the motion,

(*i*) in a court having two or more judges, on the request of a party, the challenged judge shall refer the motion to the chief judge, who shall decide the motion de novo[.]

We conclude the chief judge reached the correct conclusion that defendants' motion was untimely under MCR 2.003(D)(1)(a). Defendants needed to file the motion within 14 days of May 27, 2022 (or by June 10, 2022), or at the latest within 14 days of June 1, 2022 (or by June 15, 2022). They did not file their motion until June 17, 2022, so it was untimely. Defendants did not demonstrate good cause for the delay. We conclude the chief judge did not abuse his discretion by ruling the motion untimely under MCR 2.003(D).

## F.  EVIDENTIARY RULINGS

Defendants next argue that the trial court abused its discretion when the court (1) granted, in relevant part, plaintiff's motion in limine to preclude reference to Miller having a seizure disorder, (2) denied defendants' motion in limine to limit Dr. Spitz's expert testimony to only cause of death, (3) denied defendants' motion in limine to preclude introduction of the LARA and ORR reports, and (4) denied the motion in limine to preclude evidence of Caramia's mental condition at trial. We disagree with each argument.

### 1.  EVIDENCE OF MILLER'S SEIZURE DISORDER

The proponent of evidence has the burden to establish its relevance and admissibility. *Elher v Misra*, 499 Mich 11, 22; 878 NW2d 790 (2016). MRE 802 provides that hearsay is not admissible at trial unless the rules of evidence provide otherwise. MRE 801 explains that hearsay is a statement a declarant makes while not testifying at the trial or hearing, and that a party offers to prove the truth of the matter asserted. MRE 801(c).

Defendants' argument is that the trial court abused its discretion by ruling that admission of the past-medical-history section of a 2011 emergency-room visit report was inadmissible hearsay and not subject to admission under a hearsay exception. The parties do not dispute that the statements at issue were hearsay under MRE 801 and MRE 802. Instead, defendants maintain the statement fell within one of the hearsay exceptions, specifically MRE 803(4) or MRE 803(6).

At the time of the ruling in this case, MRE 803(4) provided that the court may allow admission of "[s]tatements made for purposes of medical treatment or medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or

sensations, or the inception or general character of the cause or external source thereof insofar as reasonably necessary to such diagnosis and treatment." *Merrow v Bofferding*, 458 Mich 617, 628; 581 NW2d 696 (1998). Whether the document itself was admissible depends on an analysis of MRE 803(6) (the business-record exception), which at the time of trial provided, in relevant part:

> A memorandum, report, record, or data compilation, in any form, of acts, transactions, occurrences, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with a rule promulgated by the supreme court or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. [MRE 803(6), as amended May 21, 2001, 464 Mich clxxvii-clxxviii (2001).]

In *Solomon v Shuell*, 435 Mich 104, 132; 457 NW2d 669 (1990) (opinion by ARCHER, J), the Michigan Supreme Court addressed the concept of trustworthiness in the context of records subject to a hearsay exception. Justice Archer explained in his initial lead opinion that "trustworthiness is presumed, subject to rebuttal, when the party offering the evidence establishes the requisite foundation." *Id*. at 125-126. That rebuttal occurs "where the source of information or the method or circumstances of preparation indicate lack of trustworthiness." *Id*. at 126 (quotation marks and citation omitted). When records are prepared in anticipation of litigation or there is a motivation to misrepresent the truth, the inherent trustworthiness in MRE 803(8) no longer applies, even though the document may technically meet the requirements of the rule. *Id*.

The trial court correctly concluded that the statement in the 2011 emergency-room record was inadmissible hearsay because it lacked trustworthiness. The record stated that Miller was admitted to the hospital after choking on a piece of steak. The court further examined the "PAST MEDICAL HISTORY" section, where the report stated, in relevant part, "Seizures, however caregiver states he has not had one in a long time." The report does not identify the caregiver. Miller also did not make these statements himself. Therefore, as the trial court concluded, this source of information indicated a lack of trustworthiness because the person providing the information is unknown. Therefore, the court did not abuse its discretion in relation to admission of evidence on Miller's history of seizures.

## 2. DR. SPITZ'S EXPERT TESTIMONY

The next issue is whether the trial court abused its discretion by denying defendants' request to preclude Dr. Spitz from testifying about Miller's conscious pain and suffering. The trial court did not rule definitively in advance of trial on whether Dr. Spitz was qualified to render an expert opinion about Miller's conscious pain and suffering. Rather, the court ruled that plaintiff could establish a foundation for Dr. Spitz's expertise at trial.

During the second day of trial, plaintiff's counsel laid a foundation for Dr. Spitz's expertise in forensic pathology and moved to have Dr. Spitz qualified as an expert. Defense counsel responded, "No objection, Your Honor." So the trial court qualified Dr. Spitz as an expert in

forensic pathology. Defense counsel did not renew his objection to Dr. Spitz's testimony about conscious pain and suffering during his testimony on the subject. Defense counsel's indication that he had no objection to Dr. Spitz's testimony in lieu of renewing his challenge to the scope of Dr. Spitz's testimony served to waive the issue on appeal. See *Reed Estate v Reed*, 293 Mich App 168, 176; 810 NW2d 284 (2011). Even if defendants had not waived the issue, this Court has indicated in previous cases that the issue of pain or suffering falls within the expertise of a forensic pathologist. *People v Unger*, 278 Mich App 210, 252; 749 NW2d 272 (2008); *Byrne v Schneider's Iron & Metal, Inc*, 190 Mich App 176, 180-181; 475 NW2d 854 (1991).

As it relates to defendants' contention that Dr. Spitz had not reviewed any records relating to Miller's intellectual impairments before his deposition, by the time of trial, Dr. Spitz had reviewed Miller's medical records, the 911 call audio recording, the medical-examiner reports, the death certificate, and multiple deposition transcripts. While defendants argue that Dr. Spitz was not prepared for his deposition, which occurred about seven months before trial, defendants do not argue on appeal that Dr. Spitz had not read enough materials before he testified at trial. For this reason, the trial court did not abuse its discretion in relation to the admission of Dr. Spitz's testimony.

### 3. LARA AND ORR REPORTS

Additionally, defendants argue that the information contained in the LARA and ORR reports was untrustworthy, for purposes of MRE 803(6), because the investigators obtained some information from plaintiff's counsel. They add that the death certificate, which was also admitted at trial, was untrustworthy because Miller's sister influenced the medical examiner's decision on cause of death. Defendants maintain that because of the trial court's ruling allowing some of these materials to be admitted at trial, defendants were forced to incorporate information from the reports into the joint statement of admitted liability. We disagree with defendants' argument.

Regarding the trustworthiness of the reports, plaintiff's counsel did not deny that the investigators contacted him on January 30, 2018, March 5, 2018, and March 6, 2018, requesting documents. On March 5, 2018, the state investigator contacted plaintiff's counsel requesting more documents. Counsel provided the documents, noting in his e-mail that the 911 call was "very helpful" and that he could send a recording, if necessary. These contacts were not initiated by plaintiff's counsel and were for the limited purpose of seeking relevant documentation. While plaintiff's counsel did proactively offer the 911 audio recording, there is no indication that his offer biased the investigation in any way. These limited contacts do not bear on the inherent trustworthiness of the ORR and LARA reports. As the trial court further reasoned, the investigators had no connection to the case other than creating their reports as part of their job duties. Thus, there was no reason to suspect that the reports lacked trustworthiness. Therefore, the trial court's ruling that the reports fell within the hearsay exception was not outside the range of reasonable and principled outcomes.

Defendant also argues that the trial court overlooked the fact that Miller's sister, Jennifer Frankford, influenced the cause of death identified on Miller's death certificate. During her deposition, Frankford testified that she spoke with the medical examiner who prepared Miller's death certificate. She testified that he was under the impression that Miller had "naturally pass[ed] away," and Frankford offered to show him a video of how physically sound Miller was. After that

conversation, the medical examiner amended the death certificate to identify asphyxiation and airway obstruction as the causes of Miller's death.

Even accepting Frankford's testimony as true, there was no dispute at trial that Miller did not die of natural causes. Nor was there any dispute that he died of asphyxiation. The dispute was over whether he died because of a seizure, where a foamy substance may have entered his airway, or whether he choked on food he obtained from somewhere in the home. The medical examiner had no reason to misrepresent the information in the death certificate. Nor did Frankford testify that the medical examiner changed the death certificate because of what she told him. Finally, the court did not preclude defendants from calling Frankford or the medical examiner as witnesses at trial to examine how the discussion may have influenced the death certificate. Defendants chose instead to admit liability. Therefore, the trial court did not abuse its discretion by permitting the admission of the death certificate at trial.

Finally, regarding defendants' argument that the reports contained hearsay within hearsay, as defined in MRE 805, the trial court conducted a thorough assessment of the reports and struck several statements within the reports as inadmissible hearsay-within-hearsay. On appeal, defendants do not point out what additional statements the trial court should have stricken. "A party may not simply announce a position and leave it to this Court to make the party's arguments and search for authority to support the party's position." *Seifeddine v Jaber*, 327 Mich App 514, 519; 934 NW2d 64 (2019). For these reasons, the trial court's ruling on the admissibility of the ORR and LARA reports and materials was not an abuse of discretion.

### 4. CARAMIA'S MENTAL-HEALTH CONDITION

Defendants also argue the trial court abused its discretion by permitting plaintiff to admit evidence bearing on Caramia's mental condition, which appeared in the joint statement of admitted liability. This argument is without merit because the trial court did not rule on this motion in limine, instead holding the final decision in abeyance pending a final ruling on the ESI dispute. If anything, the court's limited ruling favored defendants because the court restricted the scope of the admissible documents as follows: "Evidence that was not in possession of Angel's Place is excluded as not relevant to the underlying case. Previously, such information was relevant to her ability to sit for a deposition." The court never had the opportunity to rule on the merits of the motion because the parties stipulated to a joint statement of admitted liability that contained information about Caramia's mental health.

A stipulation is an agreement, admission, or concession made by the parties in the course of a judicial proceeding. *Bd of Co Road Comm'rs for the Co of Eaton v Schultz*, 205 Mich App 371, 378-379; 521 NW2d 847 (1994). Stipulations of fact are binding on the court. *Id*. at 379. Because defendants stipulated to admission of certain facts at trial bearing on Caramia's mental and physical conditions before the court had ruled on the issue, defendants cannot now raise the issue on appeal. See *Glen Lake-Crystal River Watershed Riparians v Glen Lake Ass'n*, 264 Mich App 523, 529; 695 NW2d 508 (2004) (" 'A party cannot stipulate a matter and then argue on appeal that the resultant action was error.' ") (citation omitted); *Weiss v Hodge (After Remand)*, 223 Mich App 620, 636; 567 NW2d 468 (1997) ("Where, as here, parties stipulate an arrangement that limits one party's rights to less than that which is otherwise required, that party may not later

complain on appeal about this restriction."). Therefore, the trial court did not abuse its discretion in relation to these pretrial evidentiary rulings.

## G. DISCOVERY SANCTIONS AWARD

Defendants next argue the trial court abused its discretion by awarding attorney fees and costs as discovery sanctions for Angels Place's violation of discovery in relation to ESI. We disagree.

We review a trial court's ruling on a motion for discovery sanctions for an abuse of discretion. *Hardrick v Auto Club Ins Ass'n*, 294 Mich App 651, 659; 819 NW2d 28 (2011). Additionally, a court's exercise of its inherent power to sanction a party for failing to preserve evidence it knew or should have known was relevant before litigation commenced is reviewed for an abuse of discretion. *Bloemendaal v Town & Country Sports Ctr, Inc*, 255 Mich App 207, 212; 659 NW2d 684 (2002).

As a threshold matter, plaintiff argues that this issue is not within the jurisdictional scope of the appeal in Docket Nos. 365702 and 365703 because it involves a question about the court's imposition of fees and costs as discovery sanctions, which plaintiff argues was a separate order appealable as of right. See MCR 7.202(6)(a)(*iv*) (defining a "final order" as, in relevant part, "a postjudgment order awarding or denying attorney fees and costs under court rule or other law"). The appeal "is limited to the portion of the order with respect to which there is an appeal of right." MCR 7.203(A)(1).

In *John J Fannon Co v Fannon Prod, LLC*, 269 Mich App 162, 165-166; 712 NW2d 731 (2005), this Court addressed a similar situation in which the trial court granted a motion for sanctions before deciding the amount of sanctions. This Court held that "an order that merely grants the imposition of sanctions is not a 'final order' if the amount of fees and costs remains to be determined." *Id*. at 166. We are also persuaded by this Court's unpublished opinion in *Zirnhelt v McCall*, unpublished per curiam opinion of the Court of Appeals, issued March 10, 2022 (Docket No. 354776), pp 2, 6. In *Zirnhelt*, this Court held that it had jurisdiction over the issue of attorney fees where the fees were awarded as a sanction in the final order, but the court decided the amount of sanctions in a later order. Although nonbinding, *Zirnhelt* is persuasive. See MCR 7.215(C)(1); *Cox v Hartman*, 322 Mich App 292, 307; 911 NW2d 219 (2017).

Here, the June 30, 2022 order imposing discovery sanctions was not a postjudgment order. The court ruled in May 2022 that it would grant sanctions in the form of fees, costs, and a presumptive jury instruction. The June 30, 2022 opinion was the court's written order distilling its ruling from the bench. Because of several disputes about the language of the judgment, the court did not enter the judgment until mid-October 2022. The judgment stated that plaintiff would submit and file a bill of costs and attorney fees in relation to the motion for sanctions, and defendants would have the opportunity to file objections. Later, after the judgment was entered, the trial court entered an order regarding the amount of sanctions, and a separate order denying plaintiff's motion for frivolous-defense sanctions. Those latter two orders have been appealed separately in Docket Nos. 365986, 365989, 366143, and 366145. Because the court's ruling on discovery sanctions came before the court entered the judgment (which was the order appealed),

this award of discovery sanctions falls within the scope of this Court's jurisdiction in Docket Nos. 365702 and 365703.

On the merits, we conclude the trial court did not abuse its discretion by granting sanctions in the form of attorney fees and costs, as well as a presumptive jury instruction, considering the evidence of Angels Place's discovery violations.

To start, the trial court ruled that under either version of the court rule, plaintiff was entitled to sanctions. We agree. Until January 1, 2020, MCR 2.302(B)(5) provided:

> A party has the same obligation to preserve electronically stored information as it does for all other types of information. Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system. [MCR 2.302(B)(5), as amended October 1, 2014, 497 Mich clxii-clxiii (2015).]

Under the current version of the court rules, MCR 2.302(B)(5) simply states, "[a] party has the same obligation to preserve ESI as it does for all other types of information." Thus, under both iterations of the court rule, Angels Place had the obligation to preserve ESI.

The version of MCR 2.313(E) that applied before January 1, 2020 provided:

> Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system. [MCR 2.313(E), as amended December 16, 2008, 482 Mich cxxii (2009).]

The current version of MCR 2.313(C)(1) and (D) provides:

> (C)(1) If a party fails to provide information or identify a witness as required by MCR 2.302(A) or (E), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
>
> (a) may order payment of the reasonable expenses, including attorney fees, caused by the failure;
>
> (b) may inform the jury of the party's failure; and
>
> (c) may impose other appropriate sanctions, including any of the orders listed in MCR 2.313(B)(2)(a)-(c).

* * *

-24-

(D) If ESI that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation, may order appropriate remedies, including:

(a) a presumption that the lost information was unfavorable to the party;

(b) a jury instruction directing that the jury may or must presume the information was unfavorable to the party; or

(c) dismissal of the action or entry of a default judgment.

In addition to the legal standard outlined in the court rules, the court's discovery sanction should be both "proportionate and just." *Hardrick*, 294 Mich App at 662 (quotation marks and citation omitted). Under MCR 2.313(B)(2), when a party fails to comply with a court order, "the court may require the party failing to obey the order or the attorney advising the party, or both, to pay the reasonable expenses, including attorney fees, caused by the failure." See also MCR 2.313(B)(2), as amended December 16, 2008, 482 Mich cxxii (2009) (containing the same relevant language but providing that the court "shall" require the payment of fees). Both versions of the court rule required a showing of intent, i.e., that the deletion did not result from a routine operation of an ESI system. We conclude that under either version of the Michigan Court Rules, the record supported that Angels Place engaged in ESI violations warranting discovery sanctions.

Defendants argue that the trial court did not have the authority to sanction them because the court never entered a written order to compel discovery. The general rule is that a trial court has the inherent authority to penalize misconduct through sanctions. *Persichini v William Beaumont Hosp*, 238 Mich App 626, 639-640; 607 NW2d 100 (1999). The trial court also has " 'the inherent power of a court to control the movement of cases on its docket by a variety of sanctions.' " *Id*. at 640 (citation omitted). The inherent authority allows the trial court the ability to fashion a remedy that "promotes fairness and justice." *Tolas Oil & Gas Exploration Co*, ___ Mich App at ___; slip op at 11 (citation omitted). The inherent authority to sanction litigants is broad and includes even the power to dismiss an action. *Maldonado v Ford Motor Co*, 476 Mich 372, 376; 719 NW2d 809 (2006).

As it relates to the preservation of information, "[a] litigant is under a duty to preserve evidence that it knows or reasonably should know is relevant to [an] action." *Komendat v Gifford*, 334 Mich App 138, 150; 964 NW2d 75 (2020) (quotation marks and citation omitted; second alteration in original). When a litigant fails to abide by this rule, the court may impose sanctions, including a jury instruction on spoliation. *Id*.

Not only did defendants have a general obligation to preserve evidence relevant to the litigation, but the court specifically warned defense counsel on two occasions that Angels Place must preserve any ESI relating to the litigation. To start, during a September 2021 evidentiary hearing, the court informed defense counsel that if e-mails relating to Caramia's job performance were not produced via court order that were responsive to the discovery requests, then "there's going to be sanctions, severe sanctions." The court added:

> And [defense counsel], your clients are not to have a manual or automatic deletions [sic] of anything. All of that should have been frozen at the time, but certainly the Court does not want these things to be erased or deleted at this time, and all of those provisions should be in the stock room.

The court explained:

> That will be a problem . . . . If it comes forward to me that this information isn't being provided, it's going to be a problem. You have control over the servers, the witnesses. This stuff was requested. It wasn't produced.

Then, a couple of months later, when the issue of e-mails responsive to plaintiff's *duces tecum* deposition notices was raised, the court warned defense counsel, "I want you to provide them with that information. It should have been done long ago." The court explained that if the documents were not produced that were responsive to the *duces tecum* deposition notices, "there will be sanctions." Additionally, to the extent that the withheld records included e-mails, the court ordered Angels Place to produce the e-mails in its possession responsive to the *duces tecum* deposition notices.

While it is true that a court speaks through its written orders, rather than its oral pronouncements, *Contempt of Henry*, 282 Mich App at 678, the court's oral rulings may have the same effect as a written order when, as an example, "an oral ruling clearly communicates the finality of the court's pronouncement." *Arbor Farms, LLC v GeoStar Corp*, 305 Mich App 374, 388; 853 NW2d 421 (2014). "When assessing whether an oral ruling has equal effect to that of a written order, we consider whether the oral ruling contains indicia of formality and finality comparable to that of a written order." *Id.* In this case, trial court's oral pronouncements had the same effect as a written order, particularly because the court's statements were clear, formal, and indicated finality on the issue of whether defendants had a duty to preserve evidence, including e-mails. To the extent that no written order was entered, the fault lies with defendants for not following the court's directives to prepare a written order.[7] Therefore, defendants' argument that no order existed compelling the preservation or production of documents lacks merit.

---

[7] At the November 10, 2021 hearing on plaintiff's motion for sanctions, the trial court "instructed and directed [d]efendants' counsel as follows: 'I want an order immediately to make sure that your clients are not deleting anything. I want you to provide them with that information. It should have been done long ago.' " The trial court also recognized in the June 30, 2022 Opinion and Order

-26-

Defendants next argue that there was no evidence that any substantive information was lost as the result of the deletions. We disagree.

To start, Dalman's March 16, 2022 report reflected that Angels Place deleted more than 1,200 items. Dalman determined that files were deleted and last accessed on December 8, 2021, which was the same date defendants moved for summary disposition. During the evidentiary hearing, Dalman testified that he was able to determine that someone at Angels Place had wiped two pink SanDisk flash drives clean intentionally because they had to use a specific software to do so. The documents deleted on December 8, 2021 were substantive in nature. They included staff-meeting agendas, reports for another Angels Place group home, and other documents.

Dalman located one hard drive, which Angels Place had not provided to plaintiff's counsel, containing several folders labeled "corporate," "confidential," and "Joliat Incidents." Those folders were last modified on January 18, 2019 (which was a date defense counsel met with Angels Place's representatives). Dalman also testified, on the basis of the warranty information for the computer, that it went into service on January 12, 2018 (the same day that some e-mails defendants produced untimely were time stamped). Dalman denied turning over any attorney-client privileged documents to plaintiff's counsel or that the e-mails he reviewed involved defense counsel.

For her part, Allen testified that when a flash drive is returned, Allen, or someone on her team, routinely deletes the information on it so it can be used again. However, Allen later admitted that she was on medical leave on December 8, 2021, when the flash drives were deleted. Regarding the e-mails that contained a January 12, 2018 time stamp, Allen testified she was on leave until January 13, 2018, and she was not aware of printing the e-mails containing that date. Allen also testified that she had never been informed that Angels Place was prohibited from deleting files during the pendency of this litigation. Moreover, the Joliat Home computer, including the hard drive, was replaced just days after the incident and on the same day several key e-mails were printed.

Finally, the documents that Dalman uncovered in his ESI search were relevant. They included a January 24, 2018 document that Angels Place's Human Resources Director, Andrew Cisco, created and that was entitled " 'C. Caramia Information.pdf,' " which contained information about Caramia's background with Angels Place and her work restrictions. The document included a section entitled "Land mines" containing information about Caramia's job performance. The evidence Dalman uncovered also included a September 11, 2017 e-mail discussing the fact that Caramia's annual appraisal would be "horrible." This evidence and testimony show that substantive evidence was lost or withheld as the result of the ESI violations.

Defendants also argue that the evidence presented at the evidentiary hearing did not support that the deletions were anything more than routine or that they were part of an intentional action to deprive plaintiff of the use of the information. However, the relevant documents were deleted, in large part, on the same day defendants moved for summary disposition arguing a lack of factual

that "while a written discovery order was not issued, the Court issued specific unequivocal directives, which were violated."

dispute on liability, and while Angels Place's IT specialist was on medical leave. The deletions were substantial and totaled more than 1,200 items. Moreover, Angels Place deleted documents the same day that its representatives met with defense counsel and provided additional responsive documents. Angels Place also printed out several relevant e-mails that were not produced in discovery on the same day they replaced the Joliat Home computer, which happened to be about two weeks after Miller's death. These facts supported the trial court's ruling that the ESI was not lost as the result of routine, good-faith operations of an electronic information system.

Next, defendants argue that no prejudice resulted from their deletion of the information on the flash drives and withholding of over 1,200 documents. While the trial court did not address this factor expressly in its opinion, the court acknowledged that the failure to produce evidence may prejudice another party by eliminating their ability to investigate or rebut evidence. The court explained that the evidence supported that defendants withheld "highly relevant discovery material" for about four years. Plaintiff maintained that she was prejudiced by the amount of time, money, and effort spent attempting to obtain the discovery, which warranted monetary sanctions. These facts supported a finding of prejudice. For these reasons, the trial court's decision to grant discovery sanctions is affirmed.

## III. DOCKET NOS. 365986, 365989, 366143, AND 366145

### A. FRIVOLOUS-DEFENSE SANCTIONS

Plaintiff argues in Docket Nos. 365986, 365989, 366143, and 366145 that the trial court abused its discretion by denying her request for attorney fees and costs as frivolous-defense sanctions because Angels Place had no reasonable basis to believe that the facts underlying its legal position were true. We disagree.

We review a trial court's finding on whether a defense was frivolous for clear error. *In re Costs and Attorney Fees*, 250 Mich App 89, 94; 645 NW2d 697 (2002). " 'A decision is clearly erroneous if this Court is left with a definite and firm conviction that a mistake has been made.' " *Id*. (citation omitted). We review for an abuse of discretion the trial court's decision on an attorney-fee award. See *Smith v Khouri*, 481 Mich 519, 526; 751 NW2d 472 (2008) (opinion by TAYLOR, C.J.). We review de novo questions of law. *Pirgu v United Servs Auto Ass'n*, 499 Mich 269, 274; 884 NW2d 257 (2016).

Michigan follows the American rule of attorney fees and costs, which provides that attorney fees generally are not recoverable from the losing party. *Haliw v Sterling Heights*, 471 Mich 700, 706-707; 691 NW2d 753 (2005). An exception occurs when the fee award is authorized by a statute, a court rule, or another recognized exception to the American rule. *Pioneer State Mut Ins Co v Michalek*, 330 Mich App 138, 146; 946 NW2d 812 (2019).

MCL 600.2591(1) provides:

Upon motion of any party, if a court finds that a civil action or defense to a civil action was frivolous, the court that conducts the civil action shall award to the prevailing party the costs and fees incurred by that party in connection with the

-28-

civil action by assessing the costs and fees against the nonprevailing party and their attorney.

When the court awards fees and costs under the statute, the amount of costs and fees "shall include all reasonable costs actually incurred by the prevailing party and any costs allowed by law or by court rule, including court costs and reasonable attorney fees." MCL 600.2591(2). MCL 600.2591(3) defines the term "frivolous" to mean at least one of the following: (1) "[t]he party's primary purpose in initiating the action or asserting the defense was to harass, embarrass, or injure the prevailing party[,]" (2) "[t]he party had no reasonable basis to believe that the facts underlying that party's legal position were in fact true[,]" or (3) "[t]he party's legal position was devoid of arguable legal merit." MCL 600.2591(3)(a). A "prevailing party" is "a party who wins on the entire record." MCL 600.2591(3)(b). Here, plaintiff argues that defendants had no reasonable basis to believe that the facts underlying their legal position were true.

MCR 2.625(A)(2) adds, "In an action filed on or after October 1, 1986, if the court finds on motion of a party that an action or defense was frivolous, costs shall be awarded as provided by MCL 600.2591." MCR 1.109(E), which governs the filing of frivolous documents, is also relevant in this context and provides, in relevant part:

> The signature of a person filing a document, whether or not represented by an attorney, constitutes a certification by the signer that:
>
> (a) he or she has read the document;
>
> (b) to the best of his or her knowledge, information, and belief formed after reasonable inquiry, the document is well grounded in fact and is warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law; and
>
> (c) the document is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. [MCR 1.109(E)(5).]

When a document, such as an answer, is signed in violation of MCR 1.109(E)(5),

> the court, on the motion of a party or on its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including reasonable attorney fees. The court may not assess punitive damages. [MCR 1.109(E)(6).]

Importantly, this Court has held that the statute and court rule do "not require that the entire defense or all the asserted defense be found frivolous for sanctions to issue. Rather, sanctions may issue if any defense is frivolous." *Costs and Attorney Fees*, 250 Mich App at 103. When analyzing the issue, the trial court must examine whether the defense was frivolous based on the circumstances at the time the defense was asserted. *Id*. at 94. The Michigan Supreme Court

recently clarified that when the court determines that an action or defense is frivolous, the court should apply the factors outlined in *Smith*, as modified by *Pirgu*, to determine the reasonable fee. *Bradley v Frye-Chaiken*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket Nos. 164900 and 164901); slip op at 9 n 7.

Plaintiff challenges Angels Place's defense to her negligent hiring and retention claim, where defendant argued that Angels Place had no reason to suspect Caramia could not safely supervise the residents. In her original complaint, plaintiff raised several allegations about Caramia's ability to perform her job duties and Caramia's ability to ensure the safety of the residents. Defendants neither admitted nor denied many of these allegations. The only allegations defendants denied as untrue were the allegations that (1) Caramia "was incapable of providing protection of the residents"; and (2) Caramia "was incapable of ensuring the safety of the residents."

As defendants note in their brief, plaintiff later filed a first-amended complaint in the 2020 case to add an ordinary negligence claim against each defendant. The first-amended complaint did not include the same allegations about Caramia's job performance, so defendants did not deny the allegations in their answer.

Regardless, even when examining the original complaint, defendants had some reasonable basis, even if limited, to believe that Caramia could ensure the safety and protection of the Joliat Home residents. Defendants' argument that Caramia could ensure the safety and protection of the residents was based on Caramia's 16-year history with Angels Place, as well as the Concentra evaluation that cleared her to return to work. Cisco also spoke with Caramia's health providers about her return. Initially, Angels Place transitioned Caramia back to work in an administrative role. Then, when Caramia returned to Joliat Home, Angels Place created restrictions on her ability to drive the residents and distribute medications to ensure the safety and protection of the residents.

The evidence uncovered during the ESI inspection relating to Caramia's performance problems is relevant to the negligent retention and hiring claim. As the trial court found, this evidence created a genuine issue of material fact on the issue of negligent hiring and retention. But the fact that Caramia had some performance problems in the months leading up to the incident does not establish that defendants had no reasonable basis to believe that the facts underlying their legal position were in fact true. Therefore, the trial court did not abuse its discretion by denying plaintiff's motion for frivolous-defense sanctions.[8]

---

[8] We find this case distinguishable from *Costs and Attorney Fees*, which plaintiff cites in her brief on appeal. In that case, an attorney failed to produce a letter of intent in discovery, which had terms that were favorable to the plaintiffs. *Costs and Attorney Fees*, 250 Mich App at 92-93. This Court concluded that the attorney had misrepresented the status of the letter during the litigation, made arguments as if the document never existed, and had therefore offered a frivolous defense. *Id*. at 96. Here, the documents uncovered in discovery did not render the defense entirely frivolous, but rather, offered support for plaintiff's position that Caramia could not provide safety and protection for the residents.

## B. DISCOVERY SANCTIONS

Plaintiff next argues that the trial court erred by failing to award plaintiff's full requested amount in discovery sanctions. We conclude that the trial court erred by limiting the scope of available sanctions and failing to engage in the analysis required under *Smith* and *Pirgu* to facilitate appellate review of this issue.

When an exception to the American rule exists, a party requesting attorney fees bears the burden to establish the reasonableness of the attorney fee through a three-step process: (1) the trial court will determine the reasonable hourly rate customarily charged in the same locality for similar legal services; (2) the rate is multiplied by the reasonable number of hours expended in the case, which serves as the starting point for calculating the fee; and (3) the trial court will consider several additional factors, outlined in the case, to determine if a fee departure is appropriate. *Pirgu*, 499 Mich at 274, 281, citing *Smith*, 481 Mich at 530-531, 533 (opinion by TAYLOR, C.J.). The factors are not exclusive, and the trial court may consider any other facts that are relevant. *Id*.

In *Pirgu*, the Michigan Supreme Court clarified that the trial court *must* engage in this analysis. *Pirgu*, 499 Mich at 281. Additionally, "[i]n order to facilitate appellate review, the trial court should briefly discuss its view of each of the [*Wood v Detroit Auto Inter-Ins Exch*, 413 Mich 573; 321 NW2d 653 (1982)/MRPC 1.5(a) factors] on the record and justify the relevance and use of any additional factors." *Id*. at 282.

When determining the reasonable number of hours expended, the trial court " 'should exclude excessive, redundant or otherwise unnecessary hours regardless of the attorneys' skill, reputation or experience[].' " *Kidder v Pobursky-Kidder*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 365527); slip op at 4 (alteration in original), quoting *Smith*, 481 Mich at 532 n 17 (opinion by TAYLOR, C.J.) The trial court must ordinarily conduct an evidentiary hearing on a challenge to the reasonableness of the claimed attorney fees. *Sabbagh v Hamilton Psychological Servs, PLC*, 329 Mich App 324, 359; 941 NW2d 685 (2019). " 'However, if the parties created a sufficient record to review the issue, an evidentiary hearing is not required.' " *Id*. (citation omitted).

In a June 30, 2022 opinion and order, the trial court ruled that plaintiff was entitled to sanctions for "her costs and attorney fees incurred with regard to these discovery issues." The court explained that plaintiff was entitled to "costs and attorney fees for all of the time and resources relating to the Defendant's failure to timely and fully produce discovery." Before the court ruled on the amount of fees and costs, the case was reassigned to the successor judge. During the December 14, 2022 hearing, the successor judge denied defense counsel's request for an evidentiary hearing. The court then issued a written opinion and order about four months later, in which the court concluded that the amount plaintiff sought in fees was " 'exorbitant and unreasonable.' " The court ruled that the attorney fees plaintiff sought were "for copious hours of legal services rendered which are wholly unrelated to the issue of discovery sanctions." After concluding that plaintiff was entitled to the amount necessary for having to file multiple motions for sanctions, and prepare and appear for the evidentiary hearings relating to those motions, the court concluded that plaintiff was entitled to $17,600 in attorney fees and costs.

We first note that the trial court erred to the extent that it limited the scope of the sanctions award that the predecessor judge had previously allowed in her June 30, 2022 order. As the predecessor judge ruled, plaintiff was entitled to an award of "her costs and attorney fees incurred with regard to these discovery issues." However, the successor judge narrowed the scope of the available sanctions to simply those fees and costs associated with filing the motions for sanctions and attending the related evidentiary hearings.

A trial judge or their successor may generally sua sponte reconsider their prior decisions before entry of a final judgment. See MCR 2.604(A); *Hill v City of Warren*, 276 Mich App 299, 307; 740 NW2d 706 (2007) ("The court rules therefore give the trial court explicit procedural authority to revisit an order while the proceedings are still pending and, on that reconsideration, to determine that the original order was mistaken . . . ."). However, the trial court entered a final order (the judgment) in mid-October 2022, which was several months after the court granted sanctions. At that point, the court's ruling on the scope of the sanctions award became final and appealable as of right as part of the appeal of the judgment in Docket Nos. 365702 and 365703. See MCR 2.604(A). The remaining question for the successor judge was the amount of sanctions in line with the court's earlier opinion and order. For these reasons, the trial court erred to the extent that it narrowed the scope of the allowable sanctions beyond what was previously allowed.

Additionally, the trial court erred by failing to engage in the analysis of the rate and the reasonable number of hours as outlined in *Pirgu* and *Smith*. This analysis was wholly absent. On remand, the court, whether it be the original trial judge, the successor judge, or a different judge, must articulate the reasonable hourly rate customarily charged in the same locality for similar legal services, the reasonable number of hours expended in relation to the discovery issue, and the several additional factors to determine whether a fee departure was appropriate. The court must also analyze whether the parties had developed a sufficient factual record for the court to decide the amount of sanctions and, if not, the court should conduct an evidentiary hearing. We revisit the standard for discovery sanctions mentioned above—"proportionate and just." Given this standard, we caution the trial court against unjustly limiting the scope of discovery sanctions. We imagine that "proportionate and just" discovery sanctions to cover the attorneys' fees and costs related to years of withholding and the ultimate destruction of copious amounts of evidence to be quite more substantial than $17,600.

For these reasons, we vacate the trial court's opinion and order, and remand for further proceedings consistent with this opinion.

IV. CONCLUSION

In Docket Nos. 365702 and 365703, we affirm. In Docket Nos. 366143, and 366145, we affirm the trial court's order denying frivolous-defense sanctions. In Docket Nos. 365986 and 365989, we vacate the court's order awarding $17,600 in discovery sanctions and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Adrienne N. Young
/s/ Michael J. Kelly
/s/ Kathleen A. Feeney

-32-